| | |
|---|---|
| **DONNA PEELER and KATHLEEN HANLINE, individually, on behalf of the Bayada Home Health Care 401(k) Plan and on behalf of all similarly situated participants and beneficiaries of the Plan,**<br><br>      **Plaintiffs,**<br><br>**v.**<br><br>**BAYADA HOME HEALTH CARE, INC.; THE ADMINISTRATIVE COMMITTEE OF THE BAYADA HOME HEALTH CARE 401(k) PLAN; John and Jane Does 1-30 in their capacities as members of the Administrative Committee,**<br><br>      **Defendants.** | **CIVIL ACTION FILE NO:** |

## CLASS ACTION COMPLAINT

### I. NATURE OF ACTION

1.     Plaintiffs Donna Peeler and Kathleen Hanline (collectively "Plaintiffs"), individually, as representatives of the Class described below, and on behalf of the Bayada Home Health Care 401(k) Plan (the "Plan"), bring this action under 29 U.S.C. § 1132 against Defendants Bayada Home Health Care, Inc. ("Bayada"), the Administrative Committee of the Plan (the "Committee"), and John Does 1-30 in their capacities as members of the Committee (collectively, "Defendants"), to remedy Defendants' breaches of fiduciary duties and other violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.

2.     Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (i.e., 401(k) plans), have become

the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system. Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner by which participants bear the risk of high fees and investment under-performance.

3. As fiduciaries to the Plan, Defendants were obligated at all times to act prudently and for the exclusive benefit of participants and beneficiaries. This Defendants did not do.

4. Plaintiffs bring this action to obtain the relief provided under ERISA § 409, 29 U.S.C. § 1109, for losses suffered by the Plan resulting from the Defendants' fiduciary breaches and prohibited transactions described below, and for other appropriate equitable and injunctive relief under ERISA § 502(a)(3), 29 U.S.C. U.S.C. § 1102(a)(3).

## II. JURISDICTION AND VENUE

5. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(a), 29 U.S.C. § 1132(a).

6. Venue is proper in this judicial district pursuant to ERISA Section 502(e), 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391, because Plaintiff Peeler lives in this District and worked for Defendant Bayada in this District.

## III. THE PLAN

7. Established by Bayada in 1998, the Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A), a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), and a qualified plan under 26 U.S.C. § 401.

8. According to its Investment Policy Statement, the Plan was established to provide eligible employees with the opportunity for a long-term accumulation of retirement savings

2

through employee contributions and, if applicable, employer contributions, as well as associated investment earnings.

9. At all relevant times, the Plan authorized participants to direct their retirement assets into a pre-selected menu of 28 investment offerings.

10. At all relevant times, the Plan qualified as a "large" plan. For the year ending 2023, the Plan had $342M in assets and 11,209 participants with a balance. For the year ending 2022, the Plan had $282M in assets and 10,253 participants with a balance. For the year ending 2021, the Plan had $302M in assets and 9,580 participants with a balance.

11. Morgan Stanley Smith Barney ("Morgan Stanley") has served as financial advisor and investment manager for the Plan since 2021. Prudential (now known as Empower) ("Prudential") has served as the Plan's recordkeeper as well as Directed Trustee since 2009.

## IV. THE PARTIES

12. At all relevant times, Plaintiff Donna Peeler ("Peeler"), by virtue of her employment with Bayada and participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, Peeler is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). At relevant times during the Class Period, Peeler was invested in the T. Rowe Price New Horizons I Fund. As a result of the Defendants' mismanagement of the Plan and violations of ERISA, Peeler was subject to excessive fees and underperformance and, as such, suffered financial losses.

13. At all relevant times, Plaintiff Kathleen Hanline ("Hanline"), by virtue of her employment with Bayada and participation in the Plan, is or may become eligible to receive additional benefits under the Plan as a result of Defendants' breaches and ERISA violations. Thus, Hanline is a participant as defined by ERISA § 3(7), 29 U.S.C. § 1002(7). At relevant times during

3

the Class Period, Hanline was invested in one or more of the funds discussed below. As a result of Defendants' mismanagement of the Plan and violations of ERISA, Hanline was subject to excessive fees and underperformance and, as such, suffered financial losses.

14. At all relevant times, Defendant Bayada, a large home health care company with a with over 31,000 employees and 373 offices in 21 states, is the sponsor of the Plan per ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B); a party in interest under ERISA § 3(14)(C), 29 U.S.C. § 1002(14)(C); and a Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(2)(A), to the extent that it appointed members of the Committee and otherwise exercised discretion over the administration and management of the Plan and/or control of Plan assets.

15. At all relevant times, Defendant the Committee was the Plan administrator under ERISA § 3(16), 29 U.S.C. § 1002(16); a party in interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and Plan fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that it had or exercised discretion over the administration or management of the Plan and/or control of Plan assets.

16. At all relevant times, Defendants John Does 1-30, as members of the Committee, were parties-in-interest under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), and fiduciaries of the Plan under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), to the extent that they had or exercised discretionary authority respecting the administration or management of the Plan, and/or control of Plan assets. Plaintiffs will seek leave to amend the Complaint to name each of these John Does once they ascertain their identities in discovery. The Committee and John Does 1-30 will be referred to collectively as the "Committee."

## V. FACTUAL ALLEGATIONS

### A. The Committee Violated ERISA's Duty of Prudence.

**1. The Committee Lacked a Prudent Process to Select and Monitor Plan Investments.**

17.     An ERISA fiduciary has a continuing duty to monitor trust investments and remove imprudent ones.

18.     Likewise, Plan fiduciaries must "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts Ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").

19.     Adherence to these duties requires regular performance of an adequate investigation of existing investments in a plan to determine whether any of the plan's investments are improvident, or if there is a superior alternative investment to any of the plan's holdings.

20.     An examination of the cost and fee structure of the Plan shows that the Committee did not have a viable methodology for monitoring or controlling the costs and expenses of its investment options.

21.     Modern Portfolio Theory (MPT), Prudent Investor Rule (Restatement (Third) Trusts) and ERISA's prudent expert standards required the Committee to have a prudent methodology for making sure participants' money was spent wisely.

22.     As described below, the Committee failed in this task to demonstrate the competence, skill, effort, and diligence required of a prudent fiduciary.

**a. The Committee Failed to Investigate the Availability of Lower-Cost, Equally or Better Performing Share Classes.**

23.     At all relevant times, the investment choices in the Plan during the Class Period were comprised of mutual funds or collective investment trusts.

5

24.     Shares of a single mutual fund may be offered in different "classes," corresponding to different shareholder rights and costs. All share classes charge fees for managing the investment fund. While the costs may differ, the managers, investment styles, and stocks are identical.

25.     The two most common types of mutual funds are retail funds and institutional funds. Retail class shares – such as class A, B, and C shares – are available to a broad spectrum of investors, including individuals, while institutional class shares – such as class I and R6 shares – are typically only sold to larger investors, including 401(k) plans. Institutional mutual funds typically charge lower expense ratios than retail funds but both use identical management strategies, identical portfolio managers, identical holdings and virtually identical risk characteristics.

26.     A prudent fiduciary must have a viable methodology to monitor and select proper investment options and can easily spot the best share class options for the Plan.

27.     Mutual funds, moreover, are not static, and share classes change over time as lower share classes are issued. Therefore, a fiduciary with a prudent methodology will monitor and evaluate the share classes of the available mutual funds and have established a process to move the Plan's assets into lower cost share classes as they become available.

28.     Low-cost institutional share classes of mutual funds compared to high-priced retail shares are readily available to institutional investors, such as the Plan here, which can easily meet minimum investment amounts for these share classes. Also, the prospectuses indicate that minimums are waived when the funds were held in trust (by defined contribution plans).

29.     Here, however, the Committee, throughout the Class Period, repeatedly failed to monitor investments, explore, and consider the lowest cost share class options for investments in the Plan, and follow other risk and reward metrics in the Plan's Investment Policy Statement (IPS).

Instead, the Committee deliberately selected and thereafter retained the more expensive share classes of a fund even though identically managed, higher yielding, higher returning share classes of the same fund were available.

30. The governing body overseeing mutual funds, the SEC's Office of Investor Education and Advocacy, states:

> "Some mutual funds offer investors different types of shares, known as "classes." Each class invests in the same portfolio of securities and has the same investment objectives and policies. However, each class has different shareholder services and/or distribution arrangements with different fees and expenses. Because of the different fees and expenses, each class will likely have different performance results."[1]

This makes all the classes identical except for their costs.

31. It continues with (emphasis added):

> "The more fees you pay, the less money is invested in the mutual fund share class and the less you will earn – now and over time. So, it is important that you invest in a mutual fund class that is appropriate for your financial situation and that you understand the fees associated with that share class. Also, the appropriate share class for you *might change over time*, for example, as your financial situation changes, or as *new mutual fund classes are introduced*."[2]

### b. The Committee Imprudently Selected a Higher-Cost Class of the JP Morgan Large Cap Growth Fund.

32. The best way to illustrate the Committee's imprudent choice of the JP Morgan Large Cap Growth Fund A Class is to refer to the Committee's actions in their 2021 plan year Annual Return/Report of Employee Benefit Plan (Form 5500) showing the fund's prospectus revenue-sharing.

---

[1] https://www.investor.gov/introduction-investing/investing-basics/glossary/mutual-fund-classes
[2] https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-61

7

33.     The fund's SEC prospectus lists the revenue-sharing fees incurred since the fund's inception in 1994.

34.     The JP Morgan fund's prospectus states in 2021 that the Committee's A class can credit "revenue-sharing" for their use of $95,903.64 for "12b-1 marketing" fees (0.25% per year) and another $111,248.23 for "Other" fees totaling $207,151.87. These amounts were taken directly from participants' contributions.

35.     Based on the Committee's 2021 Form 5500 filing, Bayada directed the revenue-sharing credits to the recordkeeper (Prudential/Empower). This act ensured that Bayada did not receive an administrative invoice (and participants would never see an investment or administration fee on their quarterly statements). Based on participants' invested dollars, this credit amount was used again by the Committee's members in 2022, 2023 and likely in plan year 2024.

36.     Thus, the Committee's choice of the JP Morgan Large Cap Growth A class benefited Bayada, harmed participants, and *was imprudent before the Committee even selected it and each subsequent year afterwards when they continued to do so*.

37.     The investment was also imprudent over time and was otherwise clearly unsuitable for the goals of the plan's funding policy and investment policy (based on ongoing performance).

38.     Based on the Investment Policy Statement ("IPS") and the Investment Committee Charter ("Charter"), the Committee repeatedly (quarterly) made this imprudent *plan-wide* decision using a flawed process that breached their fiduciary duty to act solely and exclusively for the benefit of the participants and beneficiaries.

39.     The cheaper, higher-yielding R6 class always (1) put less risk on participants' invested wage dollars, (2) offered more reward for wages invested and (3) actually conformed to the Charter and the IPS.

40.     The A and R6 share class prices or Net-Asset Values (NAV) were different because of costs. The Committee's chosen share class had an expense ratio of 0.94% with an embedded marketing and distribution fee (12b-1) of twenty-five basis points (0.25%). This revenue-sharing allowance credit was directed by the Committee to be paid to the recordkeeper (Prudential/Empower).

41.     The prospectus revealed the Committee's A class was NOT a "True No-Load" fund because of the extra 12b-1 kickbacks. The "True No-Load" R6 class cost fifty basis points less at 0.44% per year.

42.     The extra costs meant the Bayada participants' accounts were harmed by not only that amount but the compounded losses due to the Committee's flawed decision-making processes.

43.     A prudent process would likely have increased participants' statement values by millions of dollars.

44.     Classes A and R6 are identical in all other ways. Both classes held the same "Management Company ID" of "0C00001ERQ" and were both managed in 2021 and earlier by Devulapally, Fleiss, Lee, and Wilson (who started in August 2004). Because they are identical, their investment metrics matched for both A class and the better R6 class (except for costs):

**Table 1 – JP Morgan Large Growth classes are identical (meaningful benchmarks)**

| Share Class | Percent US Stocks | Percent Non-US Stocks | Percent Cash | Top-10 Holdings Percent | Number of Holdings | Turnover Rate | Avg Price/ Earnings Ratio | Avg Price/Book Ratio | Avg Market Cap ($mil) |
|---|---|---|---|---|---|---|---|---|---|
| A | 92.42 | 4.26 | 3.32 | 38.57 | 77 | 47 | 36.66 | 9.98 | 152,878 |
| R6 | 92.42 | 4.26 | 3.32 | 38.57 | 77 | 47 | 36.66 | 9.98 | 152,878 |

45.     Using the IPS (unsigned/undated) that was produced on Plaintiffs' request, Plaintiffs can show the Committee's imprudent conduct in the 2021 plan year.

46.     That year, the Committee selected the JP Morgan Large Cap Growth A and directed $38,361,457 of participants' saved wages into the fund. The Committee's JP Morgan Large Cap Growth A class (OLGAX) became one of the largest funds on the participants' menu, with only sixteen other choices offered by the Committee.

47.     Based on the fund's prospectus data available on or after January 1, 2021, the Committee's chosen A class held significantly less funds ($4.559B in total investor assets) compared with the cheaper, higher-yielding R6 class ($15.881B in total assets). That is because of the consistent monthly outperformance of the cheaper share class since its inception ten years before.

48.     In fact, at the time of selection, the cheaper R6 had total annual returns that were 3.22% higher over the Committee's A class choice, 7.12% higher over the prior five years and 24.6% higher over the previous ten years.

49.     The Committee's fund prospectuses display all classes at the front on the same page of the prospectus and indicate that qualified retirement plans (QRP) and "omnibus trusts" can switch classes anytime by calling JP Morgan.

      **2.     The Committee Failed to Adhere to its own IPS Criteria in Fund Class Selection.**

50.     Page 10 of the IPS provided to Plaintiffs states (in relevant part):

Performance Statistic Definitions: Sharpe Ratio - Measures an investment's reward per unit of risk. It is calculated by taking the investment's average monthly return in excess of the Treasury bill return (presumed risk free rate of return) and dividing by the monthly standard deviation of excess returns. Sortino Ratio - Quantifies an investment's reward per unit of downside risk. It is calculated similar to the Sharpe Ratio, except that it uses the monthly standard deviation of excess returns in negative markets in the denominator of the formula.

51. The cheaper class ignored by the Committee had a better "Category Ranking" for performance over the prior three and five years (violation of IPS Watch List Criteria numbers 2, 3, 6, and 7) as well as ten-year and 15-year lookback periods.

52. The Committee's IPS criteria number ten (appendix B, last page) requires the Committee's chosen fund to have a lower expense ratio than peers, but it did not. The identical R6 class had a much lower expense ratio.

53. Moreover, the Committee's A class had a 0.94% expense ratio, while the "Large Growth Average" expense ratio was 0.857%, also a violation of the IPS criteria.

54. Interest and dividends may be as much as half of an investor's total returns and are paid regardless of overall economic and market conditions. The Committee reduced the yield potential due to higher fund costs.

55. The Committee also failed to prudently investigate and act to switch to the better yielding and better IPS scoring R6 class (over the IPS' 3-year and 5-year lookback periods) using circumstances prevailing at the time of their conduct in 2021.

**Table 2: Committee's A class fees eroded all of the participants' yield**

| Name | Yield 12-Month |
|------|----------------|
| JP Morgan Large Cap Growth A | 0.00 |
| JP Morgan Large Cap Growth R6 | 0.11 |

**Table 3: R6 performed better under the IPS factors/metrics**

| Name | Sharpe 3-year | Sortino 3-year |
|------|---------------|----------------|
| JP Morgan Large Cap Growth A | 1.20 | 2.30 |
| JP Morgan Large Cap Growth R6 | 1.23 | 2.36 |

**Table 4: R6 beat the A class in every period since 2010**

| Name | Sharpe 5-year | Sortino 5-year |
|---|---|---|
| JP Morgan Large Cap Growth A | 1.18 | 2.19 |
| JP Morgan Large Cap Growth R6 | 1.21 | 2.25 |

### 3. The Committee Failed to Monitor and/or Replace its Poor-Performing Funds.

56.     The retention of the JP Morgan Large Cap Growth Fund A Class failed to comply with Page 6 of the Committee's unsigned IPS.

> The Committee's confidence in the investment manager's ability to perform in the future should be a factor in the retention or replacement of an investment option. Evaluating New or Replacement Investment Options: Should the selection of a new or replacement investment option be warranted, the investment option should pass at least 7 of the 11 Watch List Criteria to be eligible for inclusion in the investment menu of the Plan.

57.     Looking at the fund manager's performance relating to each class versus the peers, Plaintiffs find another flawed decision-making example.

58.     The Batting Average is a measure of a manager's ability to consistently beat the market. It is calculated by dividing the number of months in which the manager beat or matched the benchmark by the number of months in the period. For example, a manager who meets or outperforms the benchmark every month in a given period would have a batting average of 100. A manager who beats the benchmark half of the time would have a batting average of 50.

59.     According to Morningstar, on January 1, 2021, the managers (of all classes of the JP Morgan Large Cap Growth fund) failed to outperform their peers below.

**Table 5: Fund Manager's Skill Assessment**

| Name | Batting Average 3-year | Batting Average 5-year |
|---|---|---|
| JP Morgan Large Cap Growth A | 69.44 | 60.00 |
| JP Morgan Large Cap Growth R6 | 69.44 | 60.00 |
| Large Growth Average | 77.78 | 63.33 |

60.     The participants' annual 29 CFR § 2550.404a-5 notices used an appropriate broad-based securities market index (peers are never mentioned). The basis of comparing to prospectus indexes rests on (1) the Restatement of the Law (Third) Trusts and (2) the U.S. Securities and Exchange Commission (SEC). Both warn against using peers to compare investments. Instead, they point to using "an appropriate broad-based securities market index."

61.     The IPS terms state (emphasis added) that the "* * * Committee's confidence in *the investment manager's ability to perform in the future* will be a factor in the retention or replacement of an investment option."

62.     The SEC and 29 CFR § 2550.404a-5 ("404a-5") disallowed peer comparisons for conflicts of interest and other reasons including 1) the funds' managers' average tenure has been 6.2 years, meaning half of them quit or are fired every three years; 2) the managers sell every chosen stock after about fourteen months after purchase ("Turnover Ratio"); 3) the average peer holds only about 85 stocks versus the Russell 1000 index.

63.     Comparing one choice to its "peers" is like comparing your selection to a moving target. Indexes have no manager and positions rarely change.

64.     For example, the S&P 500 Index is an appropriate broad-based securities market index for large stocks, and it has no manager to sell any of the 500 stocks. The index components stay the same month after month.

65.     According to the SEC Form N-1A; N-3; "Disclosure of Mutual Fund Performance and Portfolio Managers" SEC Rel. # IC-19832 (April 6, 1993): "[t]he index comparison requirement is designed to show how much value the management of the fund added by showing whether the fund 'out-performed' or 'under-performed' the market . . .." (i.e., the SEC requires

13

mutual funds to use a "broad-based index" to provide investors with a benchmark for evaluating fund manager performance).

66.     Moreover, Restatement (Third) Trusts § 100 (1992 & 2003-2012) states (emphasis added) "the appropriate <u>comparator for loss calculation purposes</u> is "return rates of one or more ... <u>*suitable index mutual funds or market indexes*</u>."

67.     Plan fiduciaries are responsible for sending their employees an accurate annual 404a-5 (29 CFR § 2550.404a-5) fund fee and performance notices with "benchmark index" comparisons (never peers). The notice states: "For each investment with a variable return, the *overview also provides a benchmark which enables you to compare the performance of the investment with a broad-based securities market index*." (emphasis added).

68.     Many funds in the plan year 2018 failed to comply with the IPS criteria for retention. When reviewing prospectus information and other facts at the time of the Committee's 2018 conduct, the Committee failed to remove their chosen funds.

69.     Congress authorizes the Financial Industry Regulatory Authority (FINRA) to protect America's investors. They offer a free tool to analyze mutual fund costs and evaluate future returns of funds. Thus, the Committee's members could have quickly noted their A class expense ratio and future values were less favorable than identical, cheaper classes (than their A class) (https://tools.finra.org/fund_analyzer/).

70.     Searching for the JP Morgan Large Cap Growth fund shows the different classes and if the Committee simply used the default settings, they would see an image like the one below on June 24, 2024:

**Table 6: FINRA's Free FundAnalyzer**



71.     The image above shows the Committee's choice A class costs $1,615.57 and the R6 costs $553.87. The "Future Value (After fees & expenses)" above also shows a lower future value for the Committee's choice compared with the R6 class.

72.     In summary, the Committee's members failed to prudently choose the class and the successful manager based on their own IPS criteria of performance *(criteria: 2, 3)*, Sharpe ratio *(4, 8)*, Sortino *(5, 9)*, and expense ratio *(10)*.

**4.      The T. Rowe Price New Horizons Fund Failed to Provide Value For Costs Charged to Participants**

73.     The second paragraph of the Bayada IPS states (in relevant part):

To fulfill its fiduciary obligations with respect to the Plan, the Committee will employ a logical and diligent process to select a menu of investment options that will provide Plan participants with the range of choices necessary to assist them in meeting their retirement needs, and protection against excessive investment risk.

15

74. Bayada added the T. Rowe Price New Horizons fund to the participants' limited choices on its retirement menu in 2013.

75. At the time, this fund had not beaten its benchmark broad-based securities market index (the Russell Mid Cap Growth Index) for 27 years.

76. In 2013, the fund's returns were lower than the prospectus benchmark's returns by 9.4% and underperformed the prospectus broad-based securities market index. Yet, the Committee still added this fund to the menu for participants to choose.

77. In 2013, $6,104,039 of the participants' wages were directed toward this new investment option. By January 2022, it held $23,207,059 of participants' wages.

78. In 2013, to receive the managers' performance (loss) versus an appropriate broad-based securities market index with similar aims, risks, rewards and characteristics, a participant would have to accept 25 times more risk than a fund buying the benchmark (for each unit of return).

79. Moreover, according to the IPS Duties and Responsibilities section, the plan fiduciaries should have replaced this fund with other Mid-Cap Growth Category alternatives in 2013 and later. This, they did not.

80. Taking on excessive risk when not necessary is wasting the participants' money, which violates subsections (A), (B) and (D) of ERISA Section 404(a)(1).

81. That is, "[i]f the extra costs and risks of an investment program are substantial, these added costs and risks must be justified by realistically evaluated return expectations." Restatement (Third) of Trusts § 90, cmt. H(2).

82. Plaintiff Peeler deferred wages into the T. Rowe Price New Horizons fund during the relevant time period. The T. Rowe Price New Horizons fund's management charged 79 basis points (0.79%), regardless of performance, in 2018. Based on the risks and rewards of the fund in

2018 versus the Russell Mid Cap Growth Index, this fund should not have been retained after 2018.

83. In 2018, looking back as far as the Committee could in assessing the chosen managers' skill and ability to cover their fund's costs, the managers' risks, over 32 years, greatly exceeded the managers' returns. Thus, the T. Rowe Price New Horizons fund (all classes) should have been replaced in the Plan.

84. The managers failed to demonstrate the skill necessary to deserve their 0.79% per year in fees charged to Bayada's participants in 2018 and later.

85. Based on the (1) IPS and their (2) Forms 5500 coupled with their funds' (3) prospectus information, Plaintiffs assert that the Bayada plan fiduciaries failed to perform sufficient reviews or investigations into the performance of the Plan's chosen investments over a decade or more. The Committee members did not adequately consider data, facts and other relevant information and, therefore, committed multiple fiduciary breaches.

### 3. Other Menu Choices (Selection and Monitoring) are also Being Disputed.

86. The other funds Plaintiffs dispute include those on the Bayada Form 5500 for 2018 and later. Bayada's plan-wide flawed decision-making processes contributed to harming the entire plan's participant base.

87. Decision-making using the IPS affected every aspect of the plan's menu of investment choices.

### C. The Committee Failed to Monitor the Plan's Recordkeeping Fees.

88. The marketplace for large 401(k) retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion. Large defined contribution plans, like the Plan at issue here, have significant

17

bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for the administration of 401(k) plans and the investment of 401(k) assets.

89.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a plan by a plan's "recordkeeper." Beyond providing account statements to participants, it is quite common for the recordkeeper to provide a range of services to a plan as part of a package of services. These services typically include the preparation of individual account statements, delivery of individual account statements, claims processing, and preparation of ERISA-required disclosures to participants and regulators.

90.     Nearly all recordkeepers in the marketplace offer the same range of services. These commoditized services are essentially the same.

91.     At all relevant times, the market for recordkeeping was highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price rather than differentiating themselves based on the quality or range of services offered.

92.     ERISA explicitly requires plan fiduciaries to prudently defray plan expenses. 29 U.S.C. 1104(a)(1)(A). Accordingly, prudent fiduciaries routinely bargain for low recordkeeping fees. This is especially so given that individual plan participants cannot negotiate with recordkeepers on behalf of the Plan.

93.     The cost of providing recordkeeping services primarily depends on the number of participants in a plan, rather than the range of services provided to the plan. Because recordkeeping expenses are driven by the number of participants in a plan, most plans are charged on a per-

18

participant basis. Plans with large numbers of participants can and do take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.

94.     Recordkeeping expenses can either be paid directly from plan assets and/or indirectly by the plan's investments in a practice known as "revenue sharing."

95.     Revenue sharing payments are derived from investments within a plan, typically mutual funds.

96.     A percentage of all the money invested by plan participants in mutual funds is removed from the plan participants' investments daily and the extra costs reduce the NAV (net asset values) of the participants' funds (reduce NAVs allocated later to individual bookkeeping accounts).

97.     Via a service agreement, the Committee directs these dollars to be diverted to the plan's recordkeeper. Often then, the Committee ensures they never receive an administrative bill, and the employees never see a related payment transaction for administration on their account statements.

98.     The money taken from Plan participants via revenue sharing is not disclosed in a dollar amount, percentage, or any other meaningful way on any account statements or other documents provided to Plan participants.

99.     Fees obtained through revenue sharing are not tied to any actual services provided to a plan; rather, such fees are based on a percentage of participants' assets in a plan and/or investments in mutual funds in a plan. As the assets in a plan increase, due primarily to employee biweekly contributions, so do the recordkeeping fees that the recordkeeper pockets.

100.    When revenue sharing is left unmonitored, as here, it can be devastating for plan participants. This is especially so where, as here, Plan fiduciaries lead participants to believe that

19

the Plan is free when it actually can be quite expensive. Fees increase with periodic contributions, interest, dividends, etc., but services stay exactly the same as agreed upon in the services agreement by the Committee and the recordkeeper. Prudential has been the recordkeeper for Bayada throughout the relevant time period and back to at least 2009 (first year of electronic reporting).

101.     Prudent fiduciaries implement three related processes to manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. Second, they must make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, they must identify all fees, including direct and indirect compensation through revenue sharing, being paid to the Plan's recordkeeper. Third, they must remain informed about overall trends in the marketplace regarding the fees being paid by similar plans, as well as the recordkeeping rates that are available in the marketplace. The Committee did not implement any of these processes.

### 1.     Revenue-sharing Links Recordkeeper Costs to Participants' Potential Gains

102.     Revenue sharing is embedded in each fund's expense ratio. Thus, it is always a percentage of assets equaling invested dollars times the rate. For example, if Fund A had a fifty basis point revenue-sharing charge each year (0.50% per year) paid to the recordkeeper, a new hire with $1,000 in their 401k account pays five dollars ($5.00) for recordkeeper services that year ($1,000*0.5%).

103.     A more tenured, longer-serving participant with $100,000 in Fund A pays one hundred times more dollars for the exact same recordkeeper services ($500.00) that same year. This payment scheme is called pro rata or proportionate charges to the participants' dollars they defer from their salary or wages.

20

104.    Additionally, revenue-sharing comes directly from returns each business day and thus reduces Fund A's investment returns by the same fifty basis points above.

105.    Thus, the revenue-sharing scheme in this plan directly ties participants' investment gains to Bayada's recordkeeping payment scheme. The growth of workers' retirement is therefore interdependent with paying for covered service provider's costs. The larger the dollars involved; the more monthly compensation will be paid from Fund A to Prudential.

106.    If Defendant used funds without kickbacks or revenue-sharing, a participant's account gains would match the mutual funds manager's portfolio performance returns, net of manager's fees only. As the prospectus shows below, if the fund's manager charges 45 basis points annually, a participant's gross 5% growth is reduced to 4.55% (less the 0.45% manager's fee).

107.    But if we look at the JP Morgan Large Cap Growth A class, the gross 5% fund returns are burdened with other fees. Direct from the fund's Summary Prospectus, page 1, dated November 1, 2023, Plaintiffs found:

**Table 7: SEC Edgar Prospectus Fees (before eight basis points fee waiver)**

| (Expenses that you pay each year as a percentage of the value of your investment) | | |
|---|---|---|
| | **Class A** | **Class I** |
| **Management Fees** | 0.45% | 0.45% |
| **Distribution (Rule 12b-1) Fees** | 0.25 | NONE |
| **Other Expenses** | 0.31 | 0.31 |
| **Acquired Fund Fees and Expenses** | 0.01 | 0.01 |
| **Total Annual Fund Operating Expenses** | 1.02 | 0.77 |

108.    The R6 class is found in a different prospectus along with the other "Retirement" classes (R1, R2, and so on). Plaintiffs noted the R6 "Management fees" were less at forty basis points and the "Other Expenses" were only four basis points (0.44% total per year).

109. Due to the Committee's revenue-sharing scheme, even though no additional recordkeeper services are involved, more recordkeeper fees were paid when participants rolled over tens of millions of dollars into the Plan's funds from other retirement plans.

110. The table below demonstrates that if one participant rolled over $100,000 from another employer plan into her Bayada Plan account and selected the JP Morgan Large Cap Growth A class in 2021, she paid the following fees in the Committee's selected A class versus what she could have spent in the cheaper I class or the even cheaper R6 class:

**Table 8: Dollar Costs derived from SEC Prospectus Information**

| Participant Rollover into Bayada: | $100,000.00 | $100,000.00 | $100,000.00 |
|---|---|---|---|
| *Defendants chose A* | *Class A* | *Class I* | *Class R6* |
| "Management Fees" | 450 | 450 | 400 |
| "Distribution (Rule 12b-1) Fees" | 250 | 0 | 0 |
| "Other Expenses" | 310 | 310 | 40 |
| "Acquired Fund Fees and Expenses" | 10 | 10 | 0 |
| "Total Annual Fund Operating Expenses" | 1020 | 770 | 440 |
| One-year savings: | | 250 | 580 |
| Future value, 6 yrs at 5%, less class costs: | $126,385.97 | $128,220.19 | $130,675.28 |
| Growth difference (class I v. A & class R6 v. A): | | $1,834.22 | $4,289.31 |

22

111. The Committee could have chosen one of the cheaper fund classes but did not do so. Due to daily compounding effects, fees are equal to negative growth, and this quickly erodes the participants' retirement savings.

112. Higher daily fee deductions at market close (4pm daily) reduce the Committee's A class price (net asset value (NAV)) twice as much as the R6. Exponential fee compounding grows more impactful every business day so failures to act by Bayada hurt participants even more in 2024 and beyond:

**Table 9: Fund Class Cost Amounts**

| Classes as of 3/31/l2024 | Expense Ratio |
|---|---|
| JP Morgan Large Cap Growth A (Defendants' choice) | 0.94 |
| JP Morgan Large Cap Growth I | 0.69 |
| JP Morgan Large Cap Growth R6 | 0.44 |

113. Each cheaper class (1) yields more and (2) performs better than Bayada's A class choice against their IPS metrics. The cheaper classes have lower standard deviation/risks, and higher total returns over every observable period.

114. The insidious part of using the more expensive version revolves around the core principle of saving over time in a 401k. Harm is exacerbated against long-serving, long-tenured workers. The more wages they defer receipt of, the more fee dollars are taken from their retirement accounts and their asset prices each day at market close.

115. Due to the Committee's actions, providers' compensation increased in proportion to employees' (1) wages saved, (2) match dollars and (3) market and investment growth. Evidence from the participants' statements shows that the Committee's members used pro rata charges via revenue-sharing (not per capita or per participant).

23

### 2. Bayada Imprudently Retained the Same Recordkeeper for Over Ten Years.

116.    Based on Bayada's certified reporting to the U.S. Departments of Treasury and Labor (2009-2022), the same recordkeeper was retained and in receipt of revenue-sharing without soliciting bids from larger, cheaper recordkeepers like Fidelity, Vanguard, Schwab, and so forth.

117.    Plan fiduciaries have a duty to monitor and control recordkeeping fees to ensure that such fees remain reasonable. This is supported by the fact that every retirement plan has a funding policy that must be followed.

118.    The best way to determine the most reasonable, as opposed to the cheapest or average, market price for a given quality and level of recordkeeper services is to obtain competitive bids from other providers in the market.

### 3. Using Revenue Sharing Taken from Participants' Accounts Imprudently Tied the Growth of Accounts to Bayada's Scheme for Paying Providers.

119.    The revenue-sharing totals can quickly become astronomical as they are paid yearly on new contributions plus the earlier deposits and cash flows like interest. Bayada's employee turnover was estimated to be two times the average of the past four years, as cited by the U.S. Bureau of Labor Statistics (www.bls.gov).

120.    Using only the participants' wage deposits and match deposits to illustrate this point, the Plaintiffs used the audited financial statements from the Committee's Form 5500 plan years below to show accumulated revenue-sharing.

**Table 10: Employees' Annual Wage Contributions that Triggered More Provider Pay**

| Plan Year | Total Wage & Match Deposits |
|-----------|------------------------------|
| 2018 | 26,644,221.00 |
| 2019 | 29,234,630.00 |
| 2020 | 32,905,722.00 |
| 2021 | 42,273,848.00 |
| 2022 | 50,397,995.00 |

121.    Table 11 shows the cumulative effect of revenue-sharing reducing participants accounts each year as new contributions are made to the Plan.

**Table 11: Participants' Biweekly Contributions' Returns are Reduced**

| Ten basis points revenue-sharing on Worker's Plan Year Contributions | | | | | |
|------------|------------|------------|------------|------------|------------|
| *2018* | *2019* | *2020* | *2021* | *2022* | *Totals* |
| $26,644.22 | $26,644.22 | $26,644.22 | $26,644.22 | $26,644.22 | *$133,221.10* |
| | $29,234.63 | $29,234.63 | $29,234.63 | $29,234.63 | *$116,938.52* |
| | | $32,905.72 | $32,905.72 | $32,905.72 | *$98,717.17* |
| | | | $42,273.85 | $42,273.85 | *$84,547.70* |
| | | | | $50,398.00 | *$50,398.00* |
| *$26,644.22* | *$55,878.85* | *$88,784.57* | *$131,058.42* | *$181,456.42* | *$483,822.48* |

122.    Plaintiffs based their recordkeeper comparators' costs on the number of participant records to keep or maintain. Other costs are not relevant because participants pay them across the board for every recordkeeper. The primary costs that plan sponsors shift to the plan and all participants relate to the recurring quarterly recordkeeper fees and not and one-time transaction fees initiated by participants when they need a loan, or to pay funeral expenses, etc. (those are paid by the requesting participant).

123. For example, the largest recordkeeper in the country in 2022, Fidelity, lists all services on their ERISA Section 408(b)(2) notice below:

**Table 12: Charges Billed to Sponsor (versus paid by participant)**

| **Recordkeeping** | |
| --- | --- |
| Participant Maintenance | Billed to Plan Sponsor |
| **Transaction** | |
| In-Service Withdrawals | Paid by Participant |
| Loan Maintenance | Paid by Participant |
| Loan Setup | Paid by Participant |
| Qualified Domestic Relations Order | Paid by Participant |
| Required Minimum Distribution | Paid by Participant |
| Return of Excess Fee | Paid by Participant |

124. The table above, taken directly from one of Fidelity's recent annual plan sponsor fee disclosure notices, states that the only factor that matters when receiving recordkeeper quotes to compare your existing plan's costs is the number of participant accounts to maintain.

125. Of the seven Fidelity recordkeeper services, six are paid for by the affected participant. Recordkeeper pricing is mainly based *on the number of participant records any recordkeeper must keep or maintain.*

126. Consequently, Fidelity's recordkeeping cost for Participant A, holding $10,000, is no different than Participant B, holding $100,000. Due to competition and consolidation (like Prudential and Empower's recent merger), most larger recordkeepers charge per capita or per participant fees of ten to fifteen dollars per quarter, so each participant pays the same recordkeeper costs regardless of how long they have saved and how large of an account they hold.

127. Revenue sharing *dollars* from mutual funds, as each prospectus stipulates, always rise when the participants defer more wages (sometimes called the pro rata method of payment as defined in the plan document). Moreover, most defined contribution plans use "auto-escalation" that forces participants to defer more wages into shares of funds with daily revenue-sharing deductions so that their unrealized gains, monthly interest and dividends are reduced by embedded

26

fund fees such as SEC Rule 12b-1 fees, sub transfer agency fees, and shareholder servicing fees, and other types of fees.

128. The amount of revenue sharing received varies from one underlying investment option to another. Thus, employee savings, rollovers, and new hires increase the compensation to a provider receiving revenue-sharing like Prudential/Empower. This is shown on the Committee's Forms 5500 (Schedules C) stating Prudential received "Indirect Compensation."

129. The comparator plans contained here did not involve revenue-sharing or "Indirect Compensation," so the dollars paid were the total paid by participants.

130. The recordkeeping services for the comparator plans below matched Bayada's service codes for the Plan's recordkeeper (Prudential/Empower).

131. Bayada's "Service Codes" on their certified Forms 5500 at www.efast.dol.gov were 15 and 64 (the codes delineate recordkeepers' primary services). Ancillary services, such as codes related to participant loans, hardship distributions, QRDOs, are always paid by the participant requesting the transaction. Thus, comparator plans in the section below are meaningfully similar in all respects to Bayada's plan and its required services.

132. The methodology used for calculating the recordkeeper fees for all the comparison plans contained the following seven steps:

      a.     taking the direct compensation paid to each plan's recordkeeper directly from Schedule C of Form 5500;

      b.     reviewing the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) – Schedule of Assets;

      c.     reviewing Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan;

d.    Cross-referencing publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan;

e.    utilizing the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper;

f.    reviewing the notes of the Audited Financial Statement attached to Form 5500. In many cases, the notes to the Audited Financial Statement provide additional information that can determine each plan's pricing structure and whether revenue sharing was allocated back to the plan and/or Plan Participants and, if so, how much; and

g. reviewing the results for reasonableness and making revisions as appropriate based on Plaintiff's non-testifying experts' experience in evaluating plans with the different recordkeepers.

133.    These comparator plans are similar in participant count and assets to the Bayada Plan, except they did not use revenue-sharing mutual funds.

**Table 13: Comparison of Similar-Sized Plans' Recordkeeping Costs**

| Plan | Recordkeeper | Number of Participants | Assets | Cost Per Participant |
|---|---|---|---|---|
| Academy Ltd. | Fidelity | 7,948 | $262M | $62 |
| BJs Wholesale Club, Inc. | Fidelity | 6,711 | $489M | $22 |
| Caresource Mgmt. Services LLC | Fidelity | 5,606 | $325M | $26 |
| G4s Secure Solutions USA | Wells Fargo | 5,846 | $213M | $41 |
| OneOncology LLC | Schwab | 5,292 | $262M | $52 |
| SHI International Corp. | Fidelity | 6,633 | $495M | $53 |
| Venetian Las Vegas Gaming LLC | Fidelity | 5,982 | $359M | $54 |

**4.**     **The Committee Paid Excessive Fees for Conflicted Service Providers.**

134.    Since 2010, Bayada used participants' accounts to pay for services by UBS and Morgan Stanley.

135.    Bayada's repeated use of these providers each quarter violated the disclosure provisions of Section 408(b)(2) of ERISA regarding payments to a party in interest, including a fiduciary, for office space or any service (or a combination of services) if (emphasis added): "(1) *service is necessary for the establishment or operation* of the plan; (2) service is furnished under a contract or arrangement which is reasonable; and (3) *No more than reasonable compensation* is paid for such office space or service."

136.    These two advisory firms provided services that harmed the plan and, they and the Committee's members directed the participants to pay thousands of excessive compensation dollars over and above those paid by comparable plans to both UBS and Morgan Stanley.

137.    For example, in 2021, the Committee directed that Prudential pay Morgan Stanley a payment directly out of the trust of $75,000 in compensation for services related to choosing and monitoring investments like the JP Morgan fund discussed *supra*. They also directed $26,882 to be paid to UBS in 2021.

138.    On Bayada's Form 5500 for the 2022 plan year, Karen Miles certified under penalty of perjury that Bayada directed trust assets equaling another $100,000 to be paid to Morgan Stanley, and these dollars were taken directly from participants' accounts. Based on the Service Code "27," Morgan Stanley, like UBS earlier, was helping the Committee review the Plan's investments quarterly.

**Table 14: Actual Certified Payments to Morgan Stanley per Bayada**

| | _2017_ | _2018_ | _2019_ | _2020_ | _2021_ | _2022_ |
|---|---|---|---|---|---|---|
| Morgan Stanley | | | | | **$75,000** | **$100,000** |
| | | | | | Source: Sch. C1.2 | Source: Sch. C1.2 |
| | | | | | ID: Morgan Stanley Global Banking Opera | ID: Morgan Stanley Global Banking Opera |
| UBS Financial Services, Inc. | **$111,895** | **$125,000** | **$125,000** | **$125,000** | **$26,882** | |
| | Source: Sch. C1.2 ID: Ubs Financial Services Inc. | Source: Sch. C1.2 ID: Ubs Financial Services Inc. | Source: Sch. C1.2 ID: Ubs Financial Services Inc. | Source: Sch. C1.2 ID: Ubs Financial Services Inc. | Source: Sch. C1.2 ID: Ubs Financial Services Inc. | |

139.    These payments were (1) not for necessary services to operate this plan (many 401k plans have no advisor; they use a company committee that charges no fee) and (2) grossly excessive in their amounts. Thus, Ms. Miles incorrectly checked "NO" to Schedule H, line 4d, regarding prohibited transactions for the 2018 to 2023 plan years.

140.    Morgan Stanley's other clients of a similar size with a similar number of funds had charges to the trust that echoed those for UBS below:

**Table 15: UBS Clients Pay Less than Bayada's Participants Charges**

| Sponsor Name | Provider Name | Direct Compensation Amount | Total Plan Assets |
|---|---|---|---|
| LAITRAM LLC | UBS | $37,500 | $407,317,147 |
| MENARD INC | UBS | $40,000 | $200,060,104 |
| SHARP REES-STEALY MEDICAL GROUP INC | UBS | $21,113 | $101,252,787 |
| STAPLES INC AND SUBSIDIARIES | UBS | $25,000 | $1,278,341,558 |
| AMERICAN ANESTHESIOLOGY INC | UBS | $21,250 | $696,050,300 |
| HOLLAND AMERICA LINE NV | UBS | $32,500 | $160,969,713 |

| Sponsor Name | Provider Name | Direct Compensation Amount | Total Plan Assets |
|---|---|---|---|
| LIGHT & WONDER INC | UBS | $39,865 | $375,057,387 |
| MATHEMATICA GROUP HOLDING INC | UBS | $35,579 | $348,146,230 |
| PRINCESS CRUISE LINES LTD | UBS | $32,500 | $281,852,645 |
| REH SERVICES COMPANY | UBS | $23,500 | $186,362,424 |
| STRAUMANN MANUFACTURING INC | UBS | $33,750 | $108,007,223 |

### 5. The Committee Failed to Prudently Manage the Plan as a Whole

141. First, Plaintiffs assert that the Committee worked with (and paid from the plan) an unnecessary advisory firm to poorly construct and maintain a limited menu of about fifteen to twenty investment choices that eroded every-other-week wages and future gains, interest and dividends.

142. In most plans, about twenty percent of participants change their investments regularly, so viewing a participant's statement for one quarter does not mean they did not possess other investments during another period.

143. Thus, even if their injury is not felt now, their potential harm is imminent when they attempt to change their holdings or diversify into uncorrelated investment choices maintained on an imprudent menu controlled by Bayada and its Committee members.

144. Participants can change current account balances or their future biweekly wage deposits on any business day to other investments on the Committee's menu.

145.     The Committee and their advisory firm used only one Charter, one Investment Policy Statement (IPS) and one advisory firm to make decisions across the board for all investments.

146.     Plaintiffs treat each allegation of imprudence as a separate claim for breach of fiduciary duty. Yet, overall, Defendants breached their fiduciary duty of prudence by mismanaging the Bayada plan as a whole. The allegations of mismanagement - excessive provider compensation and costly investments - are puzzle pieces. They are not meant to paint a complete picture in isolation. Plaintiffs convey their assertions in total as they introduce pieces of evidence that support their overarching claims.

147.     The Committee violated its fiduciary duty to act exclusively in the interests of the Plan and Plan participants.

**C.     The Committee Breached Its Duty of Loyalty.**

148.     The Committee violated its fiduciary duty to act exclusively in the interests of the Plan and Plan participants.

149.     The Committee repeatedly sought open-ended investment company revenue-sharing dollars for their benefit. Instead of receiving an invoice from the recordkeeper the sought-after revenue-sharing compensation could be directed to Prudential and other covered service providers. They decided what rebates were kept by providers and what was left to be credited to participants' accounts (usually three to six months after the affected participants' revenue-sharing deductions).

150.     The Committee's use of revenue-sharing in this 401(k) reduced participants' balances daily (by decreasing net asset values (reduced trust asset pricing to participants (NAV))). The use of applying credits to participants also cost participants more than the revenue-sharing

credits could ever make up due to lost compounding from the open-ended investment company taking revenue-sharing from participants' earnings daily at 4 pm.

151. In other words, the Committee repeatedly sought open-ended investment company revenue-sharing dollars for their benefit. Instead of receiving an invoice from the recordkeeper, the sought-after revenue-sharing compensation could be directed to Prudential and other covered service providers. The Committee decided what rebates were kept by providers and what was left to be credited to participants' accounts (usually three to six months after the affected participants' revenue-sharing deductions).

152. More often than not, Committee members' selections and retentions of the Plan's investment choices included: (1) share classes that consistently had lower monthly returns from lesser yields along with (2) wasteful management fees, (3) more expensive classes of those same funds that were (4) loaded with revenue-sharing costs (that depleted participants' returns for the benefit of the Committee (based on their annual certified reports to the U.S. Departments of Treasury and Labor)).

153. Such a blatant and repetitive failure to operate the Plan in at least an impartial fashion under common trust law rules points to gross negligence on the Committee's part.

154. Even if a fiduciary's lack of prudent investigation did not cause a loss to the plan, "[t]he failure to investigate and evaluate a particular investment decision is a breach of fiduciary duty that may warrant an injunction against or the removal of the trustee." Tibble v. Edison Int'l, No. 07-cv-5359, 2010 WL 2757153, at *1 (C.D. Cal. July 8, 2010), vacated and remanded on other grounds, 843 F.3d 1187 (9th Cir. 2016).

155. The Committee was addicted to finding and using revenue-sharing credits that benefit each Plan's sponsoring corporation while failing to do the math related to the compounded harm caused by these same actions.

156. By selecting high-cost investments with revenue sharing so that it could use a portion of the fees to pay inflated fees to Prudential, the Committee acted to save itself at the expense of Plan participants and/or to favor its recordkeeper over the Plan participants and the trust.

157. The Committee knew or should have known, about the excessive nature of these fees at all pertinent times. The Committee could have achieved these enormous cost savings throughout the Class Period, based upon a cursory examination of the marketplace for defined contribution products, but chose not to look or, instead, to ignore the way Plan participants were having their retirement savings slowly eroded *en masse* by excessive fees.

## VI. CLASS ALLEGATIONS

158. Plaintiffs bring this action on behalf of themselves and the Class, which is defined as participants in and beneficiaries of the Plan but excluding Defendants; any person who was or is an officer, director, employee, or a shareholder of 5% or more of the equity of Bayada or is or was a partner, officer, director, or controlling person of Bayada; the spouse or children of any individual who is an officer, director or owner of 5% or more of the equity of Bayada; Plaintiffs' counsel; judges of the Court in which this case is pending and their current spouse and children; and the legal representatives, heirs, successors and assigns of any such excluded person.

159. The Class Period is from January 1, 2018, through the date of judgment.

160. The members of the Class are so numerous, consisting of thousands of members, not including their spouse beneficiaries, who, upon information and belief, are sufficiently

34

dispersed geographically such that joinder of all members is impracticable. The issues of liability are common to all members of the Class and are capable of common answers as those issues primarily focus on Defendants' acts. The common issues include whether Defendants breached fiduciary duties to the Plan and Plan participants, whether Defendants engaged in prohibited transactions, and the appropriate relief for Defendants' violations of ERISA.

161.    Plaintiffs' claims are typical of the claims of other members of the Class because their claims arise from the same events, practices and/or courses of conduct described above.

162.    Plaintiffs' claims are also typical of the claims of other members of the Class because the relief sought consists of requiring Defendants to make the Plan whole for any losses caused by their fiduciary breaches and to disgorge their profits to the Plan. Any such recovery from Defendants will be paid to the Plan and any relief will flow to all Class Members through their accounts in the Plan.

163.    Plaintiffs will fairly and adequately represent and protect the interests of the Class.

164.    Plaintiffs do not have any interests antagonistic to or in conflict with those of the Class.

165.    Defendants have no unique defenses against Plaintiffs that would interfere with Plaintiffs' representation of the Class.

166.    Plaintiffs are represented by counsel experienced in prosecuting ERISA class actions and with particular experience and expertise in litigation involving ERISA breaches of fiduciary duty and ERISA prohibited transactions.

167.    The requirements of Fed. R. Civ. P. 23(b)(1)(A) are satisfied. Fiduciaries of ERISA-covered plans have a legal obligation to act consistently with respect to all similarly situated participants and to act in the best interests of the Plan and its participants. This action

challenges whether Defendants acted consistently with their obligations under ERISA as to the Plan as a whole. As a result, prosecution of separate actions by individual members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct relating to the Plan.

168.    The requirements of Fed. R. Civ. P. 23(b)(1)(B) are also satisfied. Administration of an ERISA-covered plan requires that all similarly situated participants be treated the same. Resolving whether Defendants engaged in prohibited transactions with respect to the Plan and fulfilled their fiduciary obligations to the Plan would, as a practical matter, be dispositive of the interests of the other participants in the Plan even if they are not parties to this litigation and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the Class.

169.    The requirements of Fed. R. Civ. P. 23(b)(2) are satisfied as to the Class because Defendants have acted and/or failed to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Class as a whole. This action challenges whether Defendants engaged in prohibited transactions, which would be violations of ERISA as to the Plan as a whole and as to the Class as a whole. The relief sought in this case primarily consists of declarations that Defendants engaged in prohibited transactions or breached their fiduciary duties. As ERISA is based on trust law, any monetary relief consists of equitable monetary relief that would either flow directly by the declaratory or injunctive relief or flows as a necessary consequence of that relief.

170.    The requirements of Fed. R. Civ. P. 23(b)(3) are also satisfied. The common questions of law and fact concern whether Defendants engaged in prohibited transactions or breached their fiduciary duties to the Plan. As the members of the Class were participants in that

Plan, their accounts were affected by those breaches and violations. Common questions related to liability will necessarily predominate over any individual questions precisely because Defendants' duties and obligations were uniform to all participants and therefore all members of the Class. As relief and any recovery will be on behalf of the Plan, common questions as to remedies will likewise predominate over any individual issues.

171.    A class action is a superior method to other available methods for the fair and efficient adjudication of this action. As the claims generally are brought on behalf of the Plan, resolution of the issues in this litigation will be efficiently resolved in a single proceeding rather than multiple proceedings and each of those individual proceedings could seek recovery for the entire Plan. Class certification is a superior method of proceeding because it will obviate the need for unduly duplicative litigation which might result in inconsistent judgments about Defendants' duties with regard to the Plan.

172.    The following factors set forth in Rule 23(b)(3) also support certification:

a. The members of the Class have an interest in a unitary adjudication of the issues presented here for the reasons that this case should be certified under Rule 23(b)(1).

b. No other litigation concerning this controversy has been filed by any other members of the Class.

c. This District is the most desirable location for concentrating this litigation because (i) Plaintiff Peeler is located in this District; (ii) Bayada does business in this District; and (iii) a significant number of the Class members are located in this District.

d. There are no anticipated difficulties in managing this case as a class action.

### VII. TIMELINESS

173.    Within the six-year period prior to Plaintiffs' filing this suit, Defendants violated

one or more of their fiduciary obligations as described above.

174.   At all relevant times during the Class Period, Defendants also made affirmative misrepresentations to participants about the security of their investments, the competence of the portfolio fund managers, the performance history of their investments, and the amount of investment fees they were being charged.

175.   At all relevant times during the Class Period, Defendants intentionally concealed their fiduciary breaches and prohibited transactions to prevent Plan participants from discovering them and avoiding the need to cure the deficiencies.

176.   Plaintiffs did not acquire actual knowledge of these violations until 2023, within three years of the filing of this action.

177.   Consequently, Plaintiffs' claims in this action are timely under 29 U.S.C. § 1113.

178.   All conditions precedent to filing this Complaint were exhausted by Plaintiffs or waived by Defendants.

### COUNT 1: Violation of 29 U.S.C. § 1104(a)(1)(B)
### (against the Committee and John Does 1-30)

179.   Plaintiffs re-allege and incorporate in Count 1 paragraphs 1 through 148 and 159 through 179 of the Complaint.

180.   At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

181.   ERISA mandates that fiduciaries act with prudence in the disposition of Plan assets and selection and monitoring of investments, as well as in the monitoring and minimization of administrative expenses. 29 U.S.C. § 1104(a)(1)(B).

182.    As fiduciaries of the Plan, Defendants were subject to the duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aim.

183.    At all relevant times during the Class Period, Defendants breached their fiduciary duty of prudence in multiple respects as discussed above.

184.    Based on reasonable inferences from the facts set forth in this Complaint, at all relevant times during Class Period, Defendants failed to have a proper system of review in place to ensure, among other things, that: (a) participants in the Plan were being charged appropriate and reasonable fees for the Plan's third-party service providers; (b) their selection and retention of investment options were prudent; and (c) Plan expenses were reasonable and necessary.

185.    At all relevant times during the Class Period, Defendants did not have adequate procedures in place to monitor Plan service providers and investments and did not act in the best interests of the Plan participants. As a direct and proximate result of these breaches of fiduciary duties, the Plan and its participants suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

186.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches.

187.    In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

### COUNT 2: Violation of 29 U.S.C. § 1104(a)(1)(A)
### (against the Committee and John Does 1-30)

188.    Plaintiffs re-allege and incorporate in Count 2 paragraphs 1 through 179 of the Complaint.

189.    At all relevant times, Defendants were named and/or de facto fiduciaries of the Plan within the meaning of ERISA insofar that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

190.    ERISA fiduciaries owe a duty of loyalty. 29 U.S.C. § 1104(a)(1)(A). The duty of loyalty requires fiduciaries to act "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." *Id.*

191.    The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

192.    "Thus, in deciding whether and to what extent to invest in a particular investment, a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income. A decision to make an investment may not be influenced by non-economic factors unless the investment, when judged solely on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A (Dec. 19, 1988).

40

193.    At all relevant times during the Class Period, Defendants breached their fiduciary duty of loyalty in multiple respects as discussed above.

194.    As a direct and proximate result of their breaches of this fiduciary duty, the Plan and its participants suffered millions of dollars in losses. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

195.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by its breaches of fiduciary duties and must restore any profits resulting from such breaches.

196.    In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in the Prayer for Relief.

**COUNT 3: Violation of 29 U.S.C. § 1105**
**(against the Committee and John Does 1-30)**

197.    Plaintiffs re-allege and incorporate in Count 3 paragraphs 1 through 179 of the Complaint.

198.    ERISA § 405, 29 U.S.C. § 1105, makes a fiduciary of a Plan liable for another fiduciary of the same plan's breach: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary unless he makes reasonable efforts under the circumstances to remedy the breach.

199.    Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other

41

Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT 4: Violation of 29 U.S.C. § 1104(a)(1)(B)
### (against Bayada)

200.    Plaintiffs re-allege and incorporate in Count 4 paragraphs 1 through 179 of the Complaint.

201.    Defendant is the Plan Sponsor as defined by ERISA. Defendant appointed individuals to serve on the Committee. Committee members served as fiduciaries of the Plan and at the discretion of Defendant. Defendant, at all relevant times, was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

202.    Defendant, as the appointing fiduciary, had a duty to monitor the Committee at regular intervals to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

203.    Defendant also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

204.    Defendant breached its fiduciary monitoring duties by, among other things: (a) failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions; (b) failing to monitor the processes by which the Plan's expenses and investments were evaluated; and (c) failing to remove the Committee as a fiduciary whose

42

performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

205.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

206.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendant is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT 5: Violation of 29 U.S.C. § 1106(a)**
**(against the Committee and John Does 1-30)**

207.    Plaintiffs re-allege and incorporate in Count 5 paragraphs 1 through 179 of the Complaint.

208.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

209.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

210. ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

211. Each of Defendants is or was both a fiduciary and a party-in-interest subject to ERISA § 406(a)(1)(C), (D).

212. The Committee's inclusion of and failure to remove the imprudent funds in the Plan described above amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

213. To the extent any of them are not fiduciaries, Defendants, as parties-in-interest, may be held liable for knowing participation in these violations of ERISA §§ 406(a)(1)(C) and (D) pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) regardless of whether they were ERISA fiduciaries.

214. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

**COUNT 6: Violation of 29 U.S.C. § 1106(b)**
**(against the Committee and John Does 1-30)**

215. Plaintiffs re-allege and incorporate in Count 6 paragraphs 1 through 179 of the Complaint.

216. ERISA § 406(b), 29 U.S.C. § 1106(b), provides: "A fiduciary with respect to a plan shall not— (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party

44

(or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

217.	Each of Defendants is or was both a fiduciary and a party-in-interest subject to ERISA § 406(b).

218.	Defendants violated each of the above prohibited transaction rules. Their inclusion of and failure to remove the imprudent funds from the Plan described above resulted from the their "deal[ing] with the assets of the plan in [their] own interest or for [their] own account" in violation of ERISA § 406(b)(1), "act[ing] in any transaction involving the plan on behalf of a party … whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries" in violation of ERISA § 406(b)(2), and "receiv[ing] any consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."

219.	At all relevant times during the Class Period, Defendants each acquired valuable consideration as a result of the investment options recommended, selected, and retained in the Plan and as a result of the revenue sharing agreements among them.

220.	Among this consideration was rebates of Plan expenses which belonged to Plan participants, as well as portions of participant contributions they individually retained for their own benefit.

221.	The Committee engaged in prohibited transactions by selecting the imprudent funds to earn profit for Morgan Stanley at the expense of Plaintiffs' retirement investments through revenue sharing and kickback arrangements.

222.     Defendants failed to inform participants adequately of the risks of investing in the managed funds, and that the funds charged substantially higher fees than "readily available and comparable fund options."

223.     In doing so, Defendants dealt with the assets of the Plan in their own interest and/or for their own account in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

224.     In doing so, Defendants also acted adverse to the interests of the Plan and Plan participants in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

225.     And in doing so, Defendants each received consideration for their personal account from a party dealing with the Plan, in a transaction involving the assets of the Plan, in violation of ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

226.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(b).

### COUNT 7: Breach of Fiduciary Duty by Omission
### (against all Defendants)

227.     Plaintiffs restate and incorporate in Count 7 paragraphs 1 through 183 of the Complaint.

228.     As fiduciaries of the Plan with the powers to bring actions on behalf of the Plan, Defendants had the ability to bring actions on behalf of the Plan pursuant to ERISA § 502(a)(2) and ERISA § 502(a)(3) at all relevant times during the Class Period.

229.     Among the assets of an employee benefit plan under ERISA is a "chose in action" – the right to bring an action to recover a debt, money or a thing – including to institute a lawsuit for a breach of fiduciary duties or other violations. ERISA fiduciaries are prohibited from engaging in transactions under ERISA § 406(a) or 406(b) unless there is an exception or exemption, and a

claim can be brought on behalf of the Plan against an ERISA fiduciary who engages in such prohibited transactions.

230.    As a result, one of the assets of the Plan was a claim against Defendants for engaging in prohibited transactions for their own benefit as set forth in this Complaint.

231.    By virtue of the power pursuant to the Plan, Defendants had the authority to institute a claim against Defendants for engaging in prohibited transactions for their own benefit as set forth in this Complaint.

232.    Each of them either knew or through a proper review would have discovered that the other Defendants engaged in prohibited transactions in violation of ERISA as set forth in this Complaint, because each of them had knowledge of the terms of these self-dealing transactions, or through a prudent and loyal investigation in their role as Plan fiduciaries would have discovered them.

233.    Defendants did not take any action, including any legal action, or exercised any other authority under the Plan or the Trust Agreement, to properly manage this choice in action.

234.    By failing to remedy these prohibited transactions on behalf of the Plan, including by, if necessary, bringing suit against Defendants through the present, Defendants violated ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A).

235.    Because their fiduciary duties included employment of legal advisors, Defendants failed to comply with ERISA § 404(a)(1) in the administration of their specific responsibilities as fiduciaries, and this failure enabled the other Defendants to violate ERISA in their acquisition of unreasonable fees and Plan assets.

236.    As a direct and proximate result of these breaches by Defendants, the Plan suffered losses and/or Defendants obtained profits that rightfully belong to the Plan and its participants.

47

237. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan and Plan participants suffered millions of dollars in losses.

238. Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of omission.

239. Plaintiffs are entitled to equitable relief under 29 U.S.C. § 1132(a)(3) and other appropriate relief as set forth in their Prayer for Relief.

## VIII. PRAYER FOR RELIEF

Wherefore Plaintiffs pray that judgment be entered against Defendants on all claims, and request that the Court order or award the following relief:

A. Certify this action as a class action pursuant to Fed. R. Civ. P. 23, appoint the Plaintiffs as class representatives, and appoint Paul J. Sharman, Esq. of The Sharman Law Firm LLC as Class Counsel;

B. Order Defendants to disgorge any profits they received as a result of the above breaches of fiduciary duty;

C. Impose a constructive trust over these profits;

D. Impose a monetary surcharge against Defendants;

E. Apportion all amounts recovered for the Plan among the Plaintiffs and the Class;

F. Order that any amount to be paid to the Plan and/or accounts of Plaintiffs and Class members can be satisfied by using or transferring any breaching fiduciary's account (or the proceeds of that account) to the extent of that fiduciary's liability.

G. Require Defendants to pay attorneys' fees and the costs of this action pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1), or order the payment of reasonable fees and expenses to

Plaintiffs' counsel on the basis of the common benefit or common fund doctrine (or other applicable law) out of any money or benefit recovered for the Class in this action.

H. Award pre-judgment and post-judgment interest.

I. Award any other such relief the Court determines Plaintiffs and the Class are entitled to pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).

Dated:  September 9, 2024

*/s/Jon R. Moore*_____
JON R. MOORE
N.C. State Bar No. 28696
**BROWN MOORE & ASSOCIATES PLLC**
930 East Blvd.
Charlotte, NC 28203
Phone: (704) 335-1500
Fax: (704) 333-1636
Email: jmoore@brownmoorelaw.com


*/s/Paul J. Sharman*_____
PAUL J. SHARMAN (*pro hac vice* to be filed)
Georgia State Bar No. 227207
**THE SHARMAN LAW FIRM LLC**
11175 Cicero Drive, Suite 100
Alpharetta, GA 30022
Phone: (678) 242-5297
Fax: (678) 802-2129
Email: paul@sharman-law.com


*/s/Lee Melchionni*_____
LEE MELCHIONNI
District of Columbia Bar No. 1631905
**LRJ Law Group**
4062 Peachtree Rd NE, Box 167
Brookhaven, GA 30319
Phone: (717) 380-7709
Email: lee@redwoodlg.com

49