**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**CIVIL CASE NO. 1:24-cv-00231-MR**

| | | |
|---|---|---|
| **DONNA PEELER and KATHLEEN HANLINE, individually, on behalf of the Bayada Home Health Care 401(k) Plan and on behalf of all similarly situated participants and beneficiaries of the Plan,** | ) ) ) ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) ) | **MEMORANDUM OF** |
| **vs.** | ) | **DECISION AND ORDER** |
| | ) ) | |
| **BAYADA HOME HEALTH CARE, INC., THE ADMINISTRATIVE COMMITTEE OF THE BAYADA HOME HEALTH CARE 401(k) PLAN, and JOHN and JANE DOES 1-30, in their capacities as members of the Administrative Committee,** | ) ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendants' Motion to Dismiss the Amended Complaint [Doc. 28].

## I.  PROCEDURAL BACKGROUND

On September 9, 2024, the Plaintiffs Donna Peeler and Kathleen Hanline, individually and on behalf of the Bayada Home Health Care 401(k)

Plan ("the Plan") and all similarly situated participants and beneficiaries of the Plan, initiated this ERISA action against the Defendants Bayada Home Health Care, Inc. ("Bayada"), the Administrative Committee of the Plan ("the Committee"), and the members of the Committee ("the Committee members"). [Doc. 1]. On November 25, 2024, the Defendants filed a Motion to Dismiss. [Doc. 14]. On December 9, 2024, the Plaintiffs filed an Amended Class Action Complaint, [Doc. 22], and the Court denied the Defendants' Motion to Dismiss [Doc. 14] as moot.

In their Amended Complaint, the Plaintiffs claim that the Committee and the Committee members breached their duties to the members of the putative class in their choice of certain investment options and in their manner of contracting for certain services, and that Bayada, as the Plan's sponsor, breached its duty to monitor the Committee and the Committee members. [Doc. 22]. On January 15, 2025, the Defendants filed a Motion to Dismiss the Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6). [Doc. 28]. The Plaintiffs filed a Response on February 18, 2025, [Doc. 31], and the Defendants filed a Reply on March 12, 2025, [Doc. 32].

Having been fully briefed, this matter is ripe for disposition.

## II.    STANDARD OF REVIEW

### A.    Rule 12(b)(1)

Because standing is an element of subject matter jurisdiction, a motion to dismiss for lack of standing is properly analyzed under Federal Rule of Civil Procedure 12(b)(1).  See Pitt Cnty. v. Hotels.com, L.P., 553 F.3d 308, 311 (4th Cir. 2009).  The Plaintiffs bear the burden of establishing subject matter jurisdiction.  United States ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 347-48 (4th Cir. 2009).  The Court should only grant a motion to dismiss for lack of subject matter jurisdiction, however, "if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).  In making this determination, the Court should "regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."  Id.

### B.    Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).   To be

3

"plausible on its face," a plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully."  Id.

In reviewing a complaint, the Court must accept the truthfulness of all factual allegations but is not required to assume the truth of "bare legal conclusions."  Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011).  "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)."  Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012); see also Iqbal, 556 U.S. at 678 ("A pleading that offers 'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting Twombly, 550 U.S. at 555)).

Determining whether a complaint states a plausible claim for relief is "a context-specific task," Iqbal, 556 U.S. at 679, which requires the Court to assess whether the factual allegations of the Complaint are sufficient "to raise a right to relief above the speculative level," Twombly, 550 U.S. at 555. As the Fourth Circuit has explained:

> To satisfy this standard a plaintiff need not forecast evidence sufficient to prove the elements of the claim.  However, the complaint must allege sufficient facts to establish those elements.  Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is probable, the complaint must advance the plaintiff's claim across the line from conceivable to plausible.

4

<u>Walters</u>, 684 F.3d at 439 (citations and internal quotation marks omitted).

In the ERISA context, the Supreme Court has characterized a motion to dismiss for failure to state a claim as "one important mechanism for weeding out meritless claims." <u>Fifth Third Bancorp v. Dudenhoeffer</u>, 573 U.S. 409, 425 (2014).

## III.  FACTUAL BACKGROUND

Taking the well-pleaded allegations of the Amended Complaint as true, the following is a recitation of the relevant facts.

The Plaintiffs are employees of Bayada and participants in the Plan. [Doc. 22 at ¶¶ 12-13].  The Plan is a "defined contribution plan" as defined by 29 U.S.C. §1002(34).  [<u>Id.</u> at ¶ 7].  Participants in defined-contribution plans select investments from a menu of options provided by the Committee. [<u>Id.</u> at ¶¶ 9, 75].  Since the benefit ultimately received by the participants in a defined-contribution plan is dependent on the performance of their particular investments, the participants bear the risk of high fees and investment underperformance.  [<u>Id.</u> at ¶ 2].

The Plaintiffs initiated this action on behalf of themselves and a putative class, consisting of the Plan's participants and their beneficiaries, subject to a few express exceptions.  [<u>Id.</u> at ¶¶ 176-96].  The Plaintiffs allege that, from January 1, 2018 through the date of judgment (the "Class Period"),

they suffered financial losses as a result of excessive fees and investment underperformance, and that those losses are attributable to mismanagement of the Plan by the Defendants. [Id. at ¶¶ 1, 4, 12-16, 177].

## A. Selecting, Monitoring, and Retaining Funds

Through the work of the Committee members, the Committee manages the Plan by selecting and monitoring the funds offered within the Plan and administering the Plan and its costs. [Id. at ¶¶ 15-16]. Two such funds that the Committee monitored and retained during the Class Period are the JP Morgan Large Cap Growth Fund A Class and the T. Rowe Price New Horizons Fund. [Id. at ¶¶ 36, 81].

The Plaintiffs allege that the Committee's selection of the JP Morgan Large Cap Growth Fund A Class for inclusion in the Plan in 2021 was imprudent. [Id. at ¶¶ 32, 45]. That fund is "identical" to the JP Morgan Large Cap Growth Fund R6 Class, except that the R6 class has an expense ratio that is fifty basis points lower than the A class's expense ratio.[1] [Id. at ¶¶ 24-25, 39-44 & tbl.1]. Because the R6 class has lower costs, an investment in the R6 class would produce higher returns than an identical investment in the A class. [Id. at ¶¶ 39, 47-48, 55 tbls. 2-4, 59 tbl.5, 72-73 & tbl.6].

_____

[1] The Plaintiff appears to allege that the funds have identical holdings [id. at ¶ 44], but that the "R6 class always . . . put less risk on participants' invested wage dollars." [id. at ¶ 39]. The Plaintiffs assert no facts as to how this makes the funds "identical."

Nevertheless, the Committee selected the A class, rather than the R6 class, as one of the investment options available to participants in the Plan. [Id. at ¶¶ 39-52]. However, neither Plaintiff invested in the JP Morgan Large Cap Growth Fund A Class. [Id. at ¶¶ 12-13].

The Committee selected the T. Rowe Price New Horizons Fund for inclusion in the Plan in 2013. [Id. at ¶ 76]. At that time, the fund had been underperforming for a long period of time. [Id. at ¶ 77]. For example, the Committee was aware that the fund had not outperformed the Russell Mid Cap Growth Index for twenty-seven years,[2] but the Committee selected and retained the fund anyway. [Id.]. The fund's management charged seventy-nine basis points regardless of performance, resulting in management costs of $758,612.42 during the Class Period. [Id. at ¶ 84 & tbl.7]. In 2019, a new, "untested" manager began managing the T. Rowe Price fund, and he increased the fund's turnover rate, such that 53% of the holdings the new manager bought were sold in 2023. [Id. at ¶¶ 85, 87 & tbl.8]. Increased turnover entails higher transaction costs, in addition to the 0.79% management fee, thus potentially negatively impacting the fund's overall performance unless the new investments perform well enough to mitigate

---

[2] The Plaintiffs allege no facts on which the Court could discern that the T. Rowe Price fund and Russell index are of the same class so as to make any relevant comparison.

the increased costs. [Id. at ¶¶ 87-89]. The Committee was aware that the T. Rowe Price fund, in light of its historical returns, was subject to high risk. [Id. at ¶¶ 80, 91, 93]. The Plaintiffs allege that the Committee's retention of that fund was imprudent. [Id. at ¶ 91].

Plaintiff Peeler invested in the T. Rowe Price New Horizons Fund in 2020, but Plaintiff Hanline was not invested in this fund at any time during the Class Period. [Id. at ¶ 84].

## B. Fees for Recordkeeping and Advisory Services

Aside from selecting, monitoring, and retaining funds in the Plan, the Committee is responsible for monitoring and administering other aspects of the Plan, including third-party services provided by recordkeeping and advisory firms. [Id. at ¶¶ 15-16, 116-25, 154-59].

Prudential (now known as Empower) was the Plan's recordkeeper for the entire Class Period and, as such, provided the Plan with a range of administrative services. [Id. at ¶¶ 11, 98]. In 2022, the indirect and direct costs of Prudential's recordkeeping services averaged $117 per Bayada participant. [Id. at ¶ 102]. Direct costs are paid directly from the Plan's assets, and indirect costs are paid indirectly by the Plan's investments via "revenue-sharing." [Id. at ¶ 118]. Revenue-sharing costs are embedded in a fund's expense ratio. [Id. at ¶¶ 40, 126]. In 2022, the Plan's revenue-

sharing costs averaged $36 per participant. [Id. at ¶ 103]. That year, the revenue-sharing payments derived from the JP Morgan Large Cap Growth Fund A Class ($171,551) accounted for almost half of the total revenue-sharing payments ($364,035) the Plan directed to Prudential. [Id. at ¶ 103 tbl.11]. All but one of the Plan's investments incurred at least some revenue-sharing costs. [Id.].

Relying on public records—Form 5500s, which are annual retirement plan reports filed with the Department of Labor—the Plaintiffs compiled a table of alleged comparator plans that incurred lower recordkeeping fees than the Plan incurred. [Id. at ¶¶ 100 tbl.10, 113]. The Plaintiffs allege that the comparator plans are "meaningfully similar in all respects to Bayada's plan and its required services" and that they "have the same relevant service codes as Bayada's." [Id. at ¶¶ 111, 114]. None of these alleged comparator plans, however, used revenue-sharing to compensate their recordkeepers. [Id. at ¶¶ 110, 115]. Instead, the alleged comparator plans compensated their recordkeepers directly from their plans' assets. See [id. at ¶¶ 100 tbl.10, 110].

The Plan also contracted with UBS and Morgan Stanley for advisory services, paying between $100,000 and $125,000 each year during the Class Period. [Id. at ¶¶ 147, 151 tbl.18]. Relying on public records, the

Plaintiffs compiled two tables of alleged comparator plans that incurred lower advisory fees than the Plan incurred. [Id. at ¶¶ 153 tbl.19, 156 tbl.20]. The Plaintiffs also allege that the Plan's payments to UBS and Morgan Stanley were "prohibited transactions" under 29 U.S.C. § 1106 because they were "not for necessary services" and were "excessive in their amounts." [Id. at ¶ 152].

## C. The Claims in the Amended Complaint

Based on these factual allegations, the Plaintiffs assert six causes of action: that the Committee and its members breached their fiduciary duty of prudence by mismanaging the Plan (Count 1), in violation of 29 U.S.C. § 1104(a)(1)(B), [id. at ¶¶ 197-205]; that the Committee and its members breached their duty of loyalty by mismanaging the Plan (Count 2), in violation of 29 U.S.C. § 1104(a)(1)(A), [id. at ¶¶ 206-14]; that the Committee and its members are jointly and severally liable for their separate fiduciary breaches as co-fiduciaries (Count 3), pursuant to 29 U.S.C. § 1105, [id. at ¶¶ 215-17]; that Bayada breached its duty of prudence by failing to monitor the Committee and its members (Count 4), in violation of 29 U.S.C. § 1104(a)(1)(B), [id. at ¶¶ 218-224]; that the Committee and its members engaged in prohibited transactions with a party in interest (Count 5), in violation of 29 U.S.C. § 1106(a), [id. at ¶¶ 225-32]; and that the Committee

and its members engaged in prohibited transactions with a fiduciary (Count 6), in violation of 29 U.S.C. § 1106(b), [id. at ¶¶ 233-244].

For relief, the Plaintiffs request for the benefit of the class disgorgement of any profits that the Defendants received because of their alleged misconduct, a constructive trust over the disgorged profits, a monetary surcharge against the Defendants, and apportionment of "all amounts recovered for the Plan among the Plaintiffs and the Class." [Id. at 54-55]. They also request attorneys' fees, litigation costs, and appropriate interest. [Id.].

## IV. DISCUSSION

### A. Count One – Breach of the Fiduciary Duty of Prudence

Count One of the Amended Complaint asserts that the Defendants breached their fiduciary duty of prudence by failing to have an adequate process for (1) prudently selecting, monitoring, and retaining the Plan's funds in light of the funds' performance and expenses ("selection and monitoring claim"); (2) prudently monitoring recordkeeping fees and ensuring such fees were reasonable ("recordkeeping fees claim"); (3) prudently monitoring advisory fees and ensuring such fees were reasonable and for necessary services ("advisory fees claim"); and (4) prudently managing the Plan as a

whole ("Plan-wide claim"). [Doc. 22 at ¶¶ 17-165, 197-205]. Each component claim contained in Count One is addressed individually below.

### 1. Selection and Monitoring Claim

#### a. Background

The Plaintiffs assert their imprudent selection and monitoring claims pursuant to 29 U.S.C. § 1109(a) and § 1132(a)(2). [Doc. 22 at ¶ 204]. Under § 1132(a)(2), participants in retirement plans may bring civil actions "for appropriate relief under section 1109," which in turn provides that fiduciaries "shall be personally liable" for breaches of their fiduciary duties and that plaintiffs may seek both legal and equitable relief. 29 U.S.C. §§ 1132(a)(2), 1109(a). The Plaintiffs' allegations in support of their selection and monitoring claim target the selection and monitoring of only two of the Plan's funds: the JP Morgan Large Cap Growth Fund A Class, [Id. at ¶¶ 32-60, 71-74], and the T. Rowe Price New Horizons Fund, [Id. at ¶¶ 75-94].[3]

The Defendants argue in their Motion to Dismiss that the Plaintiffs lack standing to bring the selection and monitoring claim. First, the Defendants argue that the Plaintiffs lack standing to challenge the decisions regarding

---

[3] While the Plaintiffs make other general and conclusory allegations about selection and monitoring, [id. at ¶¶ 17-32, 61-70, 95-96], they have only pled sufficient factual allegations to challenge the selection and monitoring of the JP Morgan and T. Rowe Price funds.

the JP Morgan Large Cap Growth Fund A Class because neither of the Plaintiffs invested in that fund. [Doc. 29 at 8-10]. Second, the Defendants argue that the Plaintiffs lack standing to challenge the decisions regarding the T. Rowe Price New Horizons Fund, even though Plaintiff Peeler invested in it, because the Plaintiffs fail to allege that the fund underperformed while Plaintiff Peeler was invested in it. [Id. at 10-12]. As such, the Defendants argue that the Plaintiffs have not suffered a cognizable injury-in-fact. [Id. at 8-12]. The Plaintiffs respond that "the fact that the named Plaintiffs did not personally invest in each fund does not matter" because suits brought under 29 U.S.C. § 1132(a)(2) are "brought in a representative capacity on behalf of the Plan to recover losses suffered by the Plan." [Doc. 31 at 7-8].

### b. Standing

"There is no ERISA exception to Article III." Thole v. U.S. Bank N.A., 590 U.S. 538, 547 (2020). ERISA plaintiffs, like all plaintiffs, must establish Article III standing by demonstrating that (1) they "suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." Id. at 540. Even when ERISA plaintiffs assert standing as representatives of the retirement plan in which they are participants, the plaintiffs "still must have suffered an injury in fact, thus giving

them a sufficiently concrete interest in the outcome of the issue in dispute." Id. at 543 (citation and internal quotation marks omitted). Moreover, a statutory violation alone does not provide a sufficiently concrete interest to confer standing. Id. at 544; see also Spokeo, Inc. v. Robins, 578 U.S. 330, 341 (2016) ("Article III standing requires a concrete injury even in the context of a statutory violation."); TransUnion LLC v. Ramirez, 594 U.S. 413, 417 (2021) ("To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. No concrete harm, no standing."). "[P]articipants suing under ERISA have the burden of showing that they personally suffered some actual or threatened injury as a result of the allegedly unlawful conduct complained of under ERISA." David v. Alphin, 817 F. Supp. 2d 764, 781 (W.D.N.C. 2011) (concluding that plaintiffs lacked standing to challenge the selection of a fund when "none of the named plaintiffs participated in th[e] particular fund"), aff'd, 704 F.3d 327 (4th Cir. 2013); see also In re Mut. Funds Inv. Litig., 529 F.3d 207, 216 (4th Cir. 2008) ("[P]articipants in defined contribution plans controlled by ERISA have colorable claims against the fiduciaries of their plans when they allege that their individual accounts were diminished by fraud or fiduciary breaches and that the amounts by which their accounts

were diminished constitute part of the participants' benefits under the plans.").

In Thole, the Supreme Court held that ERISA plaintiffs asserting plan mismanagement under § 1132(a)(2) must allege a "concrete stake in the lawsuit" in order to establish Article III standing.  590 U.S. at 542.  The plaintiffs in Thole filed a putative class action asserting violations of ERISA's duties of loyalty and prudence, and they sought, among other things, repayment of approximately $750 million in losses that the plan allegedly suffered.  Id. at 541.  However, the plaintiffs in Thole were participants in a defined-benefit plan, so they received fixed payments each month, regardless of the actual value of the plan's assets or the investment decisions of the plan's fiduciaries.  Id. at 540.  Because the plaintiffs "would still receive the exact same monthly benefits that they are already slated to receive" *regardless* of whether they won or lost the lawsuit, the Supreme Court concluded that they had not suffered individualized injuries and thus lacked Article III standing.  Id.

Thole did not address the applicability of this individualized injury requirement in the context of defined-contribution plans, such as the one at issue herein.  However, other circuits have recently applied the individualized injury requirement in this context.  In Collins v. Northeast Grocery, Inc., 149

F.4th 163 (2d Cir. 2025), the plaintiffs alleged—in language at times identical to the language of the Amended Complaint in the instant matter[4]—the same kinds of mismanagement and asserted the same six counts against the defendants as do the Plaintiffs against the Defendants here. Id. at 167-74. The Second Circuit held that "defined contribution plan participants seeking to obtain monetary relief for alleged ERISA violations must allege a non-speculative financial loss actually affecting, or imminently threatening to affect, their individual retirement accounts." Id. at 171; see also Albert v. Oshkosh Corp., 47 F.4th 570, 578 (7th Cir. 2022) (acknowledging in the defined-contribution plan context that if the plaintiff "did not personally invest in a fund with an imprudent expense ratio, then it is difficult to see how he suffered an injury in fact"). Therefore, the Court concludes that the rationale and analysis of Thole and Collins apply to the issue of standing in this case. Accord Enstrom v. SAS Inst., No. 5:24-CV-105-D, 2025 WL 685219, at *6 (E.D.N.C. Mar. 3, 2025) ("A plaintiff must have been invested in, at minimum, one of the funds within a series to challenge that series under ERISA.").

As in Collins, the Plaintiffs in the instant matter are "defined contribution plan participants seeking to obtain monetary relief for alleged ERISA

---

[4] The plaintiffs in Collins were represented by attorney Paul Sharman, who also represents the Plaintiffs here.

violations," so they "must allege a non-speculative financial loss actually affecting, or imminently threatening to affect, their individual retirement accounts." Collins, 25 F.4th at 171; see also In re Mut. Funds Inv. Litig., 529 F.3d at 215-16. However, neither Plaintiff invested in the JP Morgan Large Cap Growth Fund A Class. As a result, the Plaintiffs have not alleged, nor can they allege, any financial loss affecting their accounts because of that fund. Accordingly, the Plaintiffs lack standing to seek monetary damages pursuant to their selection and monitoring claim based on the JP Morgan Large Cap Growth Fund A Class.

As for the T. Rowe Price New Horizons Fund, only Plaintiff Peeler invested in that fund, and she only began doing so in 2020. Thus, whether Plaintiff Peeler has standing to seek monetary damages for her selection and monitoring claim based on that fund depends on whether the allegations in the Amended Complaint establish a relevant non-speculative financial loss affecting Plaintiff Peeler's retirement account.

Many of the Plaintiffs' allegations regarding the T. Rowe Price New Horizons Fund concern conduct prior to the commencement of the Class Period, [Doc. 22 at ¶¶ 76-80], or amount to general and conclusory assertions, [id. at ¶¶ 75, 81-83, 86, 88-92, 94]. However, as relevant to the standing inquiry, the Plaintiffs also specifically allege that (1) the "fund's

management charged 79 basis points (0.79%), regardless of performance, in 2023," (2) the fund's "explicit costs total[ed] $758,612.42 since 2018," (3) the fund's manager "never earned their portfolio manager's compensation," (4) the fund was managed by "an untested manager" starting in 2019, (5) the new manager increased turnover "so that 53% of holdings that he had bought were sold in 2023," and (6) in 2020, "the Committee was aware that over a 35 year look-back period, the risk and reward relationship showed that risk was 10% versus a mean historical return of 1.1%." [Doc. 22 at ¶¶ 84-85, 87, 93; tbls.7, 8].

Nevertheless, those allegations fail individually and collectively to support a reasonable inference that Plaintiff Peeler suffered a non-speculative financial loss traceable to the T. Rowe Price New Horizons Fund. The management charge, the explicit costs, the manager's compensation, and the manager's lack of experience, without more, do not enable the Court to draw a reasonable inference that Plaintiff Peeler's account suffered a loss. All similar funds have expense ratios, costs, and managers of varying experience receiving compensation. Moreover, the relationship between risk and reward is an inadequate basis for inferring that the alleged excessive risk resulted in actual, non-speculative losses during the Class Period. Similarly, the fact of increased turnover does not raise a plausible inference

that increased turnover produced better or worse actual, non-speculative returns.

Plaintiff Peeler never alleges that she suffered an actual loss as a result of her investment in the T. Rowe Price fund. The Amended Complaint's only allegation of losses suffered individually by Plaintiff Peeler comes from a conclusory allegation that "[a]s a result of the Defendants' mismanagement of the Plan and violations of ERISA, Peeler was subject to excessive fees and underperformance and, as such, suffered financial losses." [Id. at ¶ 12]. Without the support of additional factual allegations, the Court cannot infer that Plaintiff Peeler's conclusory allegation regarding financial losses includes losses suffered because of her investment in the T. Rowe Price fund. As a result, the allegations in the Amended Complaint fail to establish that Plaintiff Peeler suffered an injury-in-fact due to her investment in that fund and the Committee's alleged mismanagement of it. The Amended Complaint "pleads facts that are 'merely consistent with' a defendant's liability" and "stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557). Accordingly, because Plaintiff Hanline never invested in the T. Rowe Price New Horizons Fund, and because Plaintiff Peeler cannot establish an injury due to her investment in that fund, the Plaintiffs lack standing to seek

monetary damages pursuant to their selection and monitoring claim based on that fund. As a result, the Plaintiffs fail to meet the standard articulated in Collins with regard to both of the funds they challenge.

### c. Equitable Relief

To the extent the Plaintiffs also seek equitable relief pursuant to their selection and monitoring claim, they need not allege a personal financial loss but must instead allege facts that would support a claim for unjust enrichment. Rose v. PSA Airlines, Inc., 80 F.4th 488, 496 n.5, 500, 504-05 (4th Cir. 2023); Peters v. Aetna Inc., 2 F.4th 199, 220-21 (4th Cir. 2021); Pender v. Bank of Am. Corp., 788 F.3d 354, 365-69 (4th Cir. 2015). To do so, the Plaintiffs must allege facts from which it can be plausibly inferred "(1) that a defendant was unjustly enriched by interfering with [their] rights and (2) that the fruits of that unjust enrichment remain in the defendant's possession or can be traced to other assets." Rose, 80 F.4th at 505.

Here, the Plaintiffs fail to allege any facts from which it can be inferred that the Defendants were unjustly enriched by their alleged breaches of the fiduciary duty of prudence with regard to the selection and monitoring of Plan funds. Instead, the Plaintiffs allege that the funds underperformed and incurred excessively high costs. The Amended Complaint's only references to the Defendants' profits are conclusory and speculative. [Doc. 22 at

¶¶ 180, 204, 213]. The Plaintiffs generally allege that the Defendants benefited from their alleged breaching conduct, but none of these allegations provide a factual basis for the Court to discern how the relevant conduct could have benefited the Defendants. [Id. at ¶¶ 36, 167, 169-70, 237-39]. Nowhere do the Plaintiffs provide nonconclusory factual allegations that the Defendants reaped any profits, unjust or otherwise, from the alleged breaching conduct.[5] Accordingly, the Plaintiffs' allegations fail to state a plausible claim for unjust enrichment that would entitle them to equitable relief under the Fourth Circuit's standard in Rose.

### d. Conclusion

The Court concludes that the Plaintiffs lack standing to seek monetary relief pursuant to their selection and monitoring claim. To the extent the Plaintiffs seek to present an equitable claim regarding the Defendants' selection and monitoring, the Court concludes that the Plaintiffs have failed to state a plausible claim for unjust enrichment that would entitle the Plaintiffs to such equitable relief. Accordingly, the Court will dismiss the selection and monitoring claim contained in Count One of the Amended Complaint.

---

[5] In their Response to Defendants' Motion to Dismiss, the Plaintiffs assert that "the ERISA Fiduciaries intentionally populated the Plan with high-cost investments that paid revenue sharing to make their jobs easier." [Doc. 31 at 24]. This allegation, however, is not pled in the Amended Complaint; in any event, such a naked assertion cannot support a theory of unjust enrichment.

## 2. Recordkeeping Fees Claim

The Plaintiffs assert in their recordkeeping fees claim that the Defendants breached their fiduciary duty of prudence by failing to adequately monitor the Plan's recordkeeping fees and ensure that such fees were reasonable. The Plaintiffs' three key recordkeeping allegations are that the Defendants (1) failed to monitor the Plan's overall recordkeeping fees and ensure they were not unreasonably higher than the fees incurred by similar plans; (2) failed to monitor the Plan's revenue-sharing agreement with the recordkeeper, Prudential, leading to excessive fees; and (3) failed to solicit bids from other recordkeepers and thus imprudently retained Prudential as the recordkeeper. [Doc. 22 at ¶¶ 97-146]. The Defendants argue that the Plaintiffs' allegations fail to establish a meaningful comparison between the Plan's recordkeeping fees and other plans' recordkeeping fees. [Doc. 29 at 15-19].

"ERISA imposes high standards of fiduciary duty on those responsible for the administration of employee benefit plans and the investment and disposal of plan assets." Tatum v. RJR Pension Inv. Comm., 761 F.3d 346, 355 (4th Cir. 2014). The duty of prudence requires a fiduciary to "discharge his duties with respect to the plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting

in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

Regarding a claim of breach of fiduciary duty of prudence based on an alleged failure to monitor excessive recordkeeper fees, "the way to plausibly plead a claim of this type is to identify similar plans offering the same services for less." <u>Matousek v. MidAmerican Energy Co.</u>, 51 F.4th 274, 279 (8th Cir. 2022); <u>see also</u> <u>Singh v. Deloitte LLP</u>, 123 F.4th 88, 93–94 (2d Cir. 2024) ("[P]laintiffs need plausibly to allege that challenged fees were excessive relative to the services rendered, or to provide allegations concerning other factors relevant to determining whether a fee is excessive under the circumstances." (citation and internal quotation marks omitted)); <u>Matney</u>, 80 F.4th at 1148 ("[W]ith recordkeeping fees, a comparison will be meaningful if the complaint alleges that the recordkeeping services rendered by the chosen comparators are similar to the services offered by the plaintiff's plan."); <u>Smith v. CommonSpirit Health</u>, 37 F.4th 1160, 1169 (6th Cir. 2022) (finding that allegations regarding recordkeeping fees must allege that the fees were excessive relative to the services rendered).

Like all allegations regarding the fiduciary duty of prudence, allegations about the management of recordkeeping costs require "context-specific

scrutiny" that can "divide the plausible sheep from the meritless goats." <u>Fifth Third Bancorp v. Dudenhoeffer</u>, 573 U.S. 409, 425 (2014). Indeed, "a prudent fiduciary might select a higher-priced recordkeeping arrangement depending on, *inter alia*, the nature and quality of the services rendered." <u>Singh</u>, 123 F.4th at 94. Consequently, courts "cannot reasonably draw an inference of imprudence simply from the allegation that a cost disparity exists; rather, the complaint must state facts to show the funds or services being compared are, indeed, comparable." <u>Matney</u>, 80 F.4th at 1149. Moreover, courts may inspect the service codes provided on relevant Form 5500s to ensure that recordkeeping fees paid by alleged comparator plans offer a meaningful comparison.[6] <u>See Matousek</u>, 51 F.4th at 279 (rejecting an alleged comparison after reviewing the relevant service codes); <u>Mator v. Wesco Distrib., Inc.</u>, 102 F.4th 172, 185 (3d Cir. 2024) (inspecting relevant service codes to determine whether a comparison was meaningful).

---

[6] "Courts routinely take judicial notice of Form 5500s." <u>Sealy v. Old Dominion Freight Line, Inc.</u>, No. 1:23-CV-819, 2024 WL 2212905, at *4 (M.D.N.C. May 16, 2024). "Form 5500s are unquestionably matters of public record. They are filed with the United States Department of Labor and are publicly available online." <u>Garnick v. Wake Forest Univ. Baptist Med. Ctr.</u>, 629 F. Supp. 3d 352, 364 (M.D.N.C. 2022). Moreover, when courts take judicial notice of Form 5500s that a plaintiff relied on, they may "refus[e] to accept as true factual allegations contradicted by these properly considered documents." <u>Matney v. Barrick Gold of N. Am.</u>, 80 F.4th 1136, 1151 (10th Cir. 2023). Here, the Amended Complaint repeatedly relies on the Form 5500s of other retirement plans. [Doc. 22 at ¶¶ 100 tbl.10, 113, 153 tbl.19]. The relevant Form 5500s are available online, and the Defendants have attached some of them to their Motion to Dismiss. [Doc. 29-2 Exs. 4-12]. Accordingly, the Court takes judicial notice of the Form 5500s relied upon in the Amended Complaint.

The requisite like-for-like comparison also extends to the form of recordkeepers' compensation: when a plaintiff "compares direct and indirect compensation to only direct recordkeeping fees in comparable plans," such a comparison functions as an "attempt[] to allege imprudence through an 'apples-to-oranges' comparison when an 'apples-to-apples' comparison is necessary." <u>Garnick</u>, 629 F. Supp. 2d at 364. Additionally, an allegation that the Plan and its recordkeeper entered into a revenue-sharing agreement is, standing alone, an insufficient basis from which to draw an inference of imprudence. <u>See</u> <u>Tussey v. ABB, Inc.</u>, 746 F.3d 327, 331 (8th Cir. 2014) (describing revenue-sharing as "a common method of compensation whereby the mutual funds on a defined contribution plan pay a portion of investor fees to a third party").

Finally, allegations that a "Defendant failed to reduce recordkeeping costs via negotiation or solicitation of competing bids" may support a recordkeeping fees claim. <u>Garnick</u>, 629 F. Supp. 2d at 366. However, "'a failure to regularly solicit quotes or competitive bids from service providers' does not necessarily give rise to an imprudence claim." <u>Mator</u>, 102 F.4th at 188-89 (quoting <u>Oshkosh</u>, 47 F.4th at 579); <u>see also</u> <u>Collins v. Ne. Grocery, Inc.</u>, No. 24-2339, 2025 WL 2383710, at *3 (2d Cir. Aug. 18, 2025) (summary order) ("[E]ven though we agree that Defendants' alleged failure to undertake

competitive bidding for recordkeeping services was probative of imprudence, that allegation was insufficient on its own to state a claim."); Matney, 80 F.4th at 1156 (affirming district court that found that "nothing in ERISA requires a fiduciary to obtain competitive bids at any regular interval").

The Plaintiffs assert a claim for relief based on the Defendants' alleged failure to monitor the Plan's overall recordkeeping fees and ensure they were not unreasonably higher than the recordkeeping fees incurred by similar plans. To support that claim, the Plaintiffs provide a table identifying eighteen comparator plans, the amount each plan paid in direct compensation to a plan recordkeeper, and the number of participants in each plan. [Doc. 22 at ¶ 100 tbl.10]. The Plaintiffs allege that the "recordkeeping services for the comparator plans . . . matched Bayada's service codes for the Plan's recordkeeper," that the alleged comparator plans are "meaningfully similar in all respects to Bayada's plan and its required services," and that the comparator plans "have the same relevant service codes as Bayada's." [Id. at ¶ 111-12, 114].

The relevant Form 5500s, however, belie those allegations. Bayada's Form 5500 includes service code "13," but none of the alleged comparator plans' Form 5500s includes that code. [Doc. 29-2 Ex. 5 (excerpting the relevant section of all but one of the Form 5500s underlying Table 10 in the

Amended Complaint)].[7]  The Plaintiffs nowhere explain this discrepancy or allege any facts that could help resolve it.  Instead, the Plaintiffs argue that such explanations are not required at this stage of litigation.  [Doc. 31 at 14-16].  They argue that they have "compared the same required public filings (Form 5500) of comparable plans and the fees disclosed therein," and that any "more thorough comparison" would require "obtaining information solely in the possession of the Defendants through discovery."  [Id.].  That argument is unpersuasive.  The discrepancy in the Plaintiffs' alleged comparison is evident from the Form 5500s themselves.  Because the Plaintiffs' recordkeeping allegations fail to establish a meaningful comparison, the Court cannot draw a reasonable inference about whether true comparator plans offered the same services for less.  See Matousek, 51 F.4th at 279; Singh, 123 F.4th at 93–94; Matney, 80 F.4th at 1148; Smith, 37 F.4th at 1169.

The Plaintiffs also assert a claim for relief based on the Defendants' alleged failure to monitor the revenue-sharing agreement between the Plan

---

[7] The one Form 5500 included in Table 10 but absent from this Exhibit is the Form 5500 for plan sponsor NYC Foot Care Services LLC.  [Doc. 22 at ¶ 100 tbl.10; Doc. 29-2 Ex. 5].  However, because NYC Foot Care Services LLC had only eight participants in its plan in 2023, it filed a Form 5500-SF (a short version of the Form 5500 for plans with fewer than 100 participants), which shows that the plan had only $3602 in costs.  See NYC Foot Care Services, LLC Form 5500-SF (2023), Part II(5)(a), Part III(8)(f).  As a result, the Form 5500-SF for NYC Foot Care Services LLC contradicts the information in Table 10, which alleges that the plan had 6,337 participants and $339,968 in costs.  [Doc. 22 at ¶ 100 tbl.10].

and the recordkeeper, leading to excessive fees. However, the Plaintiffs nowhere allege a relevant like-for-like comparison. Instead, they compare the Plan's recordkeeping fees, which included both direct compensation and revenue-sharing, to recordkeeping fees incurred by plans that included only direct compensation. Such comparisons cannot support a plausible imprudence claim, nor can the mere fact that the Plan entered into a revenue-sharing agreement. See Garnick, 629 F. Supp. 2d at 364; Tussey, 746 F.3d at 331.

Finally, the Plaintiffs allege that the Defendants failed to solicit bids from other recordkeepers. [Id. at ¶¶ 140-42]. Such allegations do not, standing alone, support a plausible imprudence claim. See Garnick, 629 F. Supp. 2d at 366; Mator, 102 F.4th at 188-89; Oshkosh, 47 F.4th at 579; Collins, 2025 WL 2383710, at *3; Matney, 80 F.4th at 1156.

Based on the foregoing, the Court concludes that the Plaintiffs' allegations in support of their recordkeeping fees claim fail to state a plausible claim for relief. The Plaintiffs have failed to adequately allege that comparator plans offered similar services for less, and the Plaintiffs' allegations regarding revenue-sharing and the failure to solicit bids from other recordkeepers are insufficient to "advance the [recordkeeping fees]

claim across the line from conceivable to plausible." <u>Walters</u>, 684 F.3d at 439

Accordingly, the Court will dismiss the recordkeeping fees claim contained in Count One of the Amended Complaint.

### 3. Advisory Fees Claim

In their advisory fees claim, the Plaintiffs assert that the Defendants breached their fiduciary duty of prudence by failing to provide adequate monitoring of the fees charged by the Plan's third-party advisory firms, UBS and Morgan Stanley.  The Plaintiffs allege that this failure to monitor resulted in excessive compensation for unnecessary services, causing harm to the Plan's participants.  [Doc. 22 at ¶¶ 149-52].  The Plaintiffs provide a table showing that the Plan paid between $100,000 and $125,000 in yearly advisory fees from 2017-2022, and they allege that the Plan should have only paid "around $30,000" per year.  [<u>Id.</u> at 151, 156; tbl.18].  The Plaintiffs provide other tables showing that alleged comparator plans paid UBS between $21,113 and $40,000 in yearly advisory fees, and that other advisory firms charged alleged comparator plans between $15,000 and $35,000 in yearly fees.  [<u>Id.</u> at 153 tbl.19, 156 tbl.20].

The Defendants argue in their Motion to Dismiss that the Plaintiffs fail to state a claim for imprudence based on the Plan's advisory fees because

the Plaintiffs' allegations fail to establish a meaningful comparison between the Plan's advisory fees and other plans' advisory fees. [Doc. 29 at 20-23]. The Plaintiffs do not address the Defendants' argument in their Response.

The standard for a plausible imprudence claim based on alleged excessive advisory fees is the same as the standard regarding a claim based on alleged excessive recordkeeping fees: the Plaintiffs must "allege that the challenged fees were excessive relative to the services rendered or otherwise allege factors relevant to determining whether a fee is excessive under the circumstance." Collins, 2025 WL 2383710, at *3 (citation and internal quotation marks omitted).

Here, the Plaintiffs' allegations fail to meet that standard. The Form 5500s on which the Plaintiffs rely to compare advisory fees contradict the Plaintiffs' allegations. According to these Forms, three of the eleven alleged comparator plans incurred higher total advisory fees, under the same service codes and in the same year, than the Plan did. [Doc. 22 at ¶ 153 tbl.19; Doc. 29-2 Exs. 6-8 (excerpting the relevant section of three Form 5500s underlying Table 19 in the Amended Complaint)]. Four of the remaining alleged comparator plans also present discrepancies with the information

alleged in Table 19.[8]  Accordingly, the Plaintiffs' tables in the Amended Complaint lack the context necessary to support a meaningful comparison.

As such, the Plaintiffs' allegations in support of their advisory fees claim fail to state a plausible claim for relief.  The Plaintiffs have failed to adequately allege that comparator plans offered similar services for less, and the Plaintiffs' allegations regarding the Plan's advisory fees are insufficient to "advance the [advisory fees] claim across the line from conceivable to plausible."  Walters, 684 F.3d at 439

Accordingly, the Court will dismiss the advisory fees claim contained in Count One of the Amended Complaint.

### 4.    Plan-Wide Claim

The Plaintiffs assert at various points in the Amended Complaint that their allegations regarding selection and monitoring, recordkeeping fees, and advisory fees serve as a basis for the Court to infer Plan-wide mismanagement and imprudence on the part of the Defendants.  [Doc. 22 at ¶¶ 29, 61, 94-96, 125, 157-65, 172].  For example, the Plaintiffs allege that

---

[8] One of the alleged comparator plans provided a different service (service code 16) at the cost alleged in Table 19.  See Straumann Manufacturing Inc. Form 5500 (2022), Schedule C(2)(A).  Another one of the alleged comparator plans provided a different service (service code 28) at a different cost than the cost alleged in Table 19.  See Mathematica Group Holding Inc. Form 5500 (2022), Schedule C(2)(A).  The Court has been unable to identify publicly available Form 5500s that match the information alleged in Table 19 for two more of the alleged comparator plans—Princess Cruise Lines Ltd. and REH Services Company.

their allegations regarding the management of the JP Morgan Large Cap Growth Fund and the T. Rowe Price New Horizons Fund reasonably support an inference that the Committee mismanaged all the funds in the Plan, such that every participant's account was injured. [Id. at ¶¶ 95-96].

Having considered and dismissed the component claims of imprudence, the Court has no reasonable basis for that inference. Therefore, to the extent the Plaintiffs assert a Plan-wide claim for breach of the fiduciary duty of prudence, the Court concludes that the Plaintiffs have failed to state a plausible claim for relief. See Collins, 149 F.4th at 173 ("We decline Plaintiffs' invitation to speculate that there were injuries to their own investment accounts based on the alleged retention of more expensive share classes in three of twenty-eight investment options, in which no Plaintiff chose to invest his or her retirement assets, and their similar invitation to speculate about harms that they did not plead with respect to other claims.").

Accordingly, the Court will dismiss the Plan-wide claim contained in Count One of the Amended Complaint.

### 5.    Conclusion

For the foregoing reasons, the Court will dismiss Count One of the Amended Complaint. To the extent the selection and monitoring claim seeks monetary damages, the claim is dismissed for lack of standing. To the extent

the selection and monitoring claim seeks equitable relief, the claim is dismissed for failure to state a plausible claim for relief.  The recordkeeping fees claim, advisory fees claim, and Plan-wide claim are also dismissed for failure to state a plausible claim for relief.

## B.  Count Two – Breach of the Fiduciary Duty of Loyalty

ERISA requires fiduciaries to "scrupulously adhere to a duty of loyalty, and make any decision in a fiduciary capacity with an eye single to the interests of the participants and beneficiaries."  DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 418-19 (4th Cir. 2007) (citation and internal quotation marks omitted).  Specifically, the duty of loyalty requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A).  "The duty is absolute, meaning the fiduciary must exclude all selfish interest."  Reetz v. Aon Hewitt Inv. Consulting, Inc., 74 F.4th 171, 181 (4th Cir. 2023) (citation and internal quotation marks omitted).  However, "[l]oyalty claims cannot 'piggyback' prudence claims, but must contain independent facts," and "prudence claims regarding recordkeeping may not simply be repackaged as a disloyalty claim

without additional allegations." <u>Kendall v. Pharm. Prod. Dev., LLC</u>, No. 7:20-CV-71-D, 2021 WL 1231415, at *11 (E.D.N.C. Mar. 31, 2021).

Here, the Plaintiffs' only nonconclusory allegations in support of their disloyalty claim either depend on the Committee's use of revenue-sharing, [Doc. 22 at ¶¶ 167-69, 173-74], or restate the predicates of the Plaintiffs' imprudence claim, [<u>id.</u> at 170-72]. The Plaintiffs' allegations in support of their disloyalty claim include no facts meaningfully independent of their allegations in support of their imprudence claim. As a result, the Plaintiffs cannot state a plausible claim for relief under § 1104(a)(1)(A).

Accordingly, the Court will dismiss Count Two of the Amended Complaint.

## C. Count Three – Co-Fiduciary Liability

ERISA provides that "a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan" if the fiduciary (1) knowingly participates in or conceals the breaching conduct, (2) violates the duty of loyalty in a manner that "enable[s] such other fiduciary to commit a breach," or (3) "has knowledge of a breach

by such other fiduciary" and fails to take "reasonable efforts under the circumstances to remedy the breach." 29 U.S.C. § 1105(a).

The Plaintiffs' only allegations regarding co-fiduciary liability restate the elements of § 1105. [Doc. 22 at ¶¶ 215-17]. Because mere recitals of the elements of a claim are insufficient to state a claim for relief, and because the Court has dismissed the Plaintiffs' claims that the Defendants violated their duties of prudence and loyalty, the Court concludes that the Plaintiffs have failed to state a plausible claim for relief under § 1105. See Collins, 2025 WL 2383710, at *5 (affirming dismissal of claim for co-fiduciary liability when predicate claims for breaches of the duties of loyalty and prudence were dismissed).

Accordingly, the Court will dismiss Count Three of the Amended Complaint.

### D. Count Four – Breach of the Duty to Monitor

The Plaintiffs assert that Bayada, as the Plan's sponsor, breached its duty to monitor the Committee in violation of 29 U.S.C. § 1104(a)(1)(B), which imposes a duty of prudence on fiduciaries. Count Four is a derivative claim that attempts to hold the Plan's sponsor liable for the Committee's alleged breach of the duty of prudence. However, "[b]ecause Plaintiffs did not plausibly allege that the Committee acted imprudently, their duty to

monitor claim predicated on an underlying breach of the duty of prudence fail[s] as a matter of law."  Collins, 2025 WL 2383710, at *5.

Accordingly, the Court will dismiss Count Four of the Amended Complaint.

### E. Count Five – Prohibited Transaction with a Party in Interest

ERISA prohibits fiduciaries from a causing a retirement plan to engage in certain transactions with a party in interest.  29 U.S.C. § 1106(a).  A "party in interest" includes any entity "providing services" to the plan.  Id. § 1002(14).  One of the prohibited transactions with a party in interest is the "furnishing of goods, services, or facilities."  Id. § 1106(a)(1)(C).  As a result, § 1106 would appear to prohibit fiduciaries from causing a retirement plan to contract with any third-party service provider.  To mitigate that result, § 1108 provides exemptions to that prohibition in certain circumstances.  However, in Cunningham v. Cornell University, 604 U.S. 693 (2025), a unanimous Supreme Court held that the exemptions in § 1108 are affirmative defenses that a plaintiff need not "anticipate and negate in her pleading."  Id. at 702 (quoting Perry v. Merit Sys. Prot. Bd., 582 U.S. 420, 435 n.9 (2017)). Accordingly, any transaction that satisfies the elements of § 1106—e.g., any transaction for third-party services—is "presumptively unlawful."  Id. at 700.

The presumptive unlawfulness of a transaction, however, does not relieve a plaintiff of the burden to establish standing. Despite seemingly lowering the pleading requirements for § 1106 claims, the Cunningham Court nevertheless exhorted district courts to "dismiss suits that allege a prohibited transaction occurred but fail to identify any injury." Id. at 708. Relying on Cunningham, the District Court for the District of Massachusetts recently dismissed a prohibited transaction claim for lack of standing because the complaint "point[ed] to no instance in which a tangible loss of value was actually incurred by [the plaintiff]." Taylor v. BDO USA, P.C., No. 25-10128, 2025 WL 2420941, at *3 (D. Mass. Aug. 21, 2025). The Taylor court stated that "[w]ithout a showing that any harm flowed from the Transaction to [the plaintiff], including any post-Transaction decline in the value of [the plaintiff's retirement] account, the court cannot conclude, beyond mere speculation, that [the plaintiff] has suffered a constitutionally cognizable injury." Id.

Here, the Amended Complaint presents two bases for the Plaintiffs' prohibited transaction claim.[9]    First, the Plaintiffs allege that the Plan

---

[9] The Plaintiffs assert a different basis for their prohibited transaction claim in their Response to the Defendant's Motion to Dismiss, arguing that "the ERISA Fiduciaries paid Prudential excessive compensation for unnecessary services rendered to the plan." [Doc. 31 at 24]. Because this claim is not alleged in the Amended Complaint, the Court need not address it. See, e.g., Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 165-66 (4th Cir. 2016) ("A motion to dismiss tests the sufficiency of a complaint, and our evaluation is thus generally limited to a review of the allegations of the complaint itself." (citation and internal quotation marks omitted)).

engaged in prohibited transactions during the 2018 to 2023 plan years by making payments to UBS and Morgan Stanley that (1) were "not for necessary services," in that "many 401k plans have no advisor," and that (2) were "grossly excessive in their amounts." [Doc. 22 at ¶ 152]. The Plaintiffs allege that the money for these payments was "taken directly from participants' accounts." [Id. at ¶ 151].

However, other portions of the Plaintiffs' Amended Complaint undercut these allegations. For example, the very next paragraph of the Amended Complaint provides a table full of examples of "clients of a similar size with a similar number of funds" that *did* contract for advisory services, thereby contradicting the Plaintiffs' assertion that comparable 401k plans "have no advisor." [Id. at ¶¶ 152-53]. Moreover, the Plaintiffs' allegations fail to draw a meaningful comparison between the advisory fees incurred by the Plan and the advisory fees incurred by the alleged comparator plans. See supra Section IV.A.3. Finally, the Plaintiffs nowhere allege that the value of their individual accounts declined because of these advisory fees.

As a result, the Plaintiffs' advisory fees allegations provide no more than a speculative basis for inferring that the Plaintiffs themselves incurred an actual loss because of the Plan's payments for advisory services. These

advisory fee allegations, like the allegations in <u>Taylor</u>, fail to establish a constitutionally cognizable injury.

Second, when the Plaintiffs directly address transactions prohibited by § 1106(a) in Count Five of the Amended Complaint, they allege that the "Committee's inclusion of and failure to remove the imprudent funds in the Plan" amount to prohibited transactions in violation of § 1106(a)(1)(C) or (D). [<u>Id.</u> at ¶ 230]. This allegation, however, fails to set forth facts fulfilling the relevant elements of a § 1106(a)(1)(C) or (D) claim because it states neither that goods, services, or facilities were furnished nor that assets of the plan were transferred to, or used by or for the benefit of, a party in interest. Moreover, the Plaintiffs fail to assert sufficient facts to show that the Committee's selection and monitoring of the Plan's funds caused the Plaintiffs a constitutionally cognizable injury. <u>See</u> <u>supra</u> Section IV.A.1.[10]

Accordingly, the Court will dismiss Count Five of the Amended Complaint for lack of standing.

---

[10] The Plaintiffs also allege that the Defendants are parties in interest, implying that the Defendants breached § 1106(a) by improper self-dealing. [Doc. 22 at ¶ 229]. There are no nonconclusory allegations, however, of any benefits flowing to the Defendants from any transactions.

## F.    Count 6 – Prohibited Transaction with a Fiduciary

ERISA prohibits fiduciaries from causing a retirement plan to enter into certain transactions with another fiduciary.  29 U.S.C. § 1106(b).  Under 29 U.S.C. § 1106(b), it is unlawful for a fiduciary to (1) "deal with the assets of the plan in his own interest or for his own account," (2) "act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries," or (3) "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  29 U.S.C. § 1106(b).

The Plaintiffs allege that the Defendants violated § 1106(b) through the "inclusion of and failure to remove the imprudent funds from the Plan," such as "selecting the imprudent funds to earn profit for Morgan Stanley at the expense of Plaintiffs' retirement investments through revenue-sharing and kickback arrangements."  [Doc. 22 at ¶¶ 236, 239].  The Plaintiffs further allege that the "Defendants each acquired valuable consideration," including "rebates of Plan expenses" and "portions of participant contributions they individually retained for their own benefit," for their management of the Plan's investments.  [Id. at ¶¶ 237-38].

Nearly identical allegations were addressed in <u>Collins</u> and found to be insufficient to state a plausible claim under § 1106(b). <u>Collins</u>, 2025 WL 2383710, at *5 (dismissing § 1106(b) claim because the allegations were "too conclusory," and "the complaint provided no factual basis to distinguish between ordinary compensation for services in the form of revenue-sharing payments and illicit kickbacks" (citation and internal quotation marks omitted)). The Plaintiffs' allegations likewise fail here. The Plaintiffs have presented only conclusory allegations to support their § 1106(b) claim. Nothing in the Plaintiffs' Amended Complaint supports a reasonable inference that the Committee members engaged in the forms of self-dealing prohibited by § 1106(b).

Accordingly, the Court will dismiss Count Six of the Amended Complaint.

## V. CONCLUSION

For the foregoing reasons, the Court will grant the Defendants' Motion to Dismiss the Amended Complaint. Because the Plaintiffs lack standing to seek monetary damages for the selection and monitoring claim contained in Count One, and for Count Five, those claims will be dismissed without prejudice. The Court will dismiss all other claims contained in Count One, as well as Counts Two, Three, Four, and Six, with prejudice.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendants' Motion to Dismiss the Amended Complaint [Doc. 28] is hereby **GRANTED**. Because the Plaintiffs lack standing to seek monetary damages for the selection and monitoring claim contained in Count One, and for Count Five, those claims are **DISMISSED WITHOUT PREJUDICE**. All other claims contained in Count One, as well as Counts Two, Three, Four, and Six, are **DISMISSED WITH PREJUDICE**.

The Clerk is respectfully requested to close this civil case.

**IT IS SO ORDERED.**

Signed: January 27, 2026

Martin Reidinger
Chief United States District Judge